GEORGE E. GORDON, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

When one accused of the crime of murder is required to account for his whereabouts at a particular time, to avoid the force of criminating circumstances, his omission to produce such evidence is not, in law, conclusive of the facts in dispute.

The absence of an attempt to account for his whereabouts, when it appears to be in the power of the prisoner to do so, is strong presumptive evidence against him.

But the force of such circumstance must be left for the consideration of the jury; and it is error for the court to instruct them that it is of a "conclusive character;" or that, by such omission, doubtful evidence of guilt "ripens into certainty."

*William J. Hadley*, for the plaintiff in error.

*A. J. Parker* and *S. F. Higgins*, for the defendants in error.

BROWN, J. The plaintiff in error was indicted for the murder of Owen Thompson, and tried and convicted at a Court of Oyer and Terminer held in and for the county of Albany. Several exceptions were taken by the prisoner's counsel in the progress of the trial, but I shall only examine those which were taken to the charge of the court. These present questions of some difficulty, and that they may be more clearly seen and apprehended it will be well to advert to the leading features of the case as disclosed by the testimony.

In September, 1864, there was at West Albany, in the county of Albany, a place called Bull's Head, kept as a tavern and cattle yard, where drovers and persons dealing in cattle were in the habit of congregating. During the afternoon of Thursday, the 15th of September, 1864, the deceased, Owen Thompson, who resided in the city of New York, arrived at the Bull's Head, his ostensible business being to purchase cattle. He remained there the next day (Friday, the 16th), and was seen on the stoop of the tavern or hotel

as late as 20 minutes after 8 o'clock in the evening of the 16th, and was not seen again until the next morning at 7 o'clock, when he was discovered lying in a lonely place in a lane remote from the house, and within a few feet from the gate to cattle yard No. 35, having in the meantime received several severe wounds upon the back of his head, causing an extensive fracture around the base of the brain, and his pocket-book, containing a considerable sum of money, abstracted from his pocket on the inside of his vest. He died from these wounds two days afterwards, being unconscious and unable to speak during that time. On Friday morning, the 16th, a young man, a stranger, appeared at the Bull's Head inquiring whether a man had staid there who had driven in cattle from Saratoga county, and representing that he expected eighteen or twenty head of cattle which his uncle was driving in from Saratoga. He applied to the yard keeper to hire a cattle yard. He was offered several, and amongst others yard No. 14. He said it was too large. He finally hired No. 35, which is larger than No. 14 and more remote from the house. The cattle he spoke of did not arrive. He disappeared from the hotel some time during the night of the 16th, and did not return. The last seen of him was in company with the deceased, Owen Thompson, at 20 minutes past 8 o'clock in the evening, upon the stoop of the hotel. This was the last time Thompson was seen before he was found with his skull fractured. This person was seen a number of times in company and in conversation with the deceased during the day, and heard him speak of having a large sum of money upon his person, and saw him several times exhibit his pocket-book with apparently a large sum of money in it. The circumstances rendered it highly probable, and the jury would have been justified in the presumption (and this was the theory of the prosecution), that this man (whoever he was) could be no other than the murderer of Thompson. Eight witnesses were called and examined on the part of the prosecution to establish the identity of the prisoner as the same person who was last seen in company with the deceased at 20 minutes past 8 o'clock in the evening of the 16th of

September. Five of them were persons attached to the hotel, and three others were cattle dealers, who had been in company with the suspected person at some time during the day. The man was a stranger to all of them, but some saw more of him than others, and had better opportunities for observation. Some spoke hesitatingly on the subject, and others with positiveness.

The keeper of the hotel testified: "I saw a man at West Albany on the day Thompson was killed, who looked like Gordon; I don't mean to swear positively that the prisoner is the same man I saw at West Albany September 16th." The cattle yard keeper testified: "The prisoner resembles the man." And on his cross-examination, "the young man did not appear as tall as the prisoner, and appeared fuller in the face; will not swear positively that the prisoner is the young man." A female servant employed in the house, testified: "The prisoner looks like that young man." The barber of the hotel, who saw the person repeatedly during the day, testified: "The prisoner is the man;" and on his cross-examination, "prisoner looks like the young man; I don't know as I can be positive that this person is the man I saw at West Albany September 16th; I recognized him as he was brought a prisoner to West Albany." A cattle dealer named Hoag testified that he "conversed with the young man about cattle coming in from Saratoga; the prisoner resembles that young man; my best judgment is that the prisoner is the same young man; have formed a conviction from my knowledge that this (the prisoner) is the man; will not swear positively that he is the man." A laborer employed in the hotel, named Welsh, and who was the person who last saw the young man and Thompson conversing together, testified: "The prisoner is the man; saw him on the car at Schenectady; I told the crowd there I thought he was not the man; I told the crowd so in order to get out of it; from the first time I saw him after his arrest I had made up my mind he was the man." A cattle dealer named Martin testified: "I think prisoner is the man; I won't swear positively he is the man." Another cattle dealer named

Genter testified: "The prisoner is the man I saw at West Albany." This witness procured the arrest of Gordon at Schenectady, just four weeks after the homicide. He testified in substance, that he was going to his home at Fort' Plain on the Central railroad cars. A person inquired of the conductor if he would be in Schenectady in time to take the train to Ballston. He thought he knew the voice, and turned round to see who it was, he recognized him (the prisoner) to be the same man he saw with Thompson at West Albany. "He smiled, and I returned it; he said, friend, I think I've seen you before; han't I seen you behind a bar? I told him I kept a public house at Fly Bush, also an eating saloon at Fort Plain; he said he had never been at Fly Bush, and I think he said he had never been at Fort Plain; then, said I, friend, I can tell you where you saw me, you saw me at West Albany; I said I was a cattle dealer, and he was the young man who said he had 18 two-year old steers coming from Saratoga from his uncle; he gave me no answer; I saw his color changed; he looked pale and looked out of the window; I could not get his eye again while he was in the car; I made up my mind he was the man I saw with Thompson at West Albany." On the arrival of the train at Schenectady he gave information to the police officers which led to the prisoner's arrest. This was the substance of the proof for the prosecution to identify Gordon as the same man who was at West Albany on the day and evening of the murder. There was also some attempt at identification by a defect in the front teeth, but the proof was of no great weight. The prisoner gave no evidence whatever, nor made any attempt to prove where he was on the 16th of September. Neither was there any proof to show affirmatively that if he was not the man he could have shown by any witness that he was at some other place. The evidence showed that he had been out of employment from the spring of 1864; that he did not live with his wife at Greenbush, opposite Albany; that he had no regular abiding place, boarding at obscure taverns in Albany for a few days at a time, and then leaving on being asked to pay his bills, and leaving them

unpaid; idling away his time in the bar-rooms in Greenbush and Albany. Prior to the spring of 1864 his place of residence was in Greenbush, and after that he lived a few days at a time in Albany down to about the time of the homicide. It was upon this point of the identification of the prisoner with the person seen at West Albany on the 16th of September, and whom the evidence presumptively pointed out as the murderer of Thompson, to which the principal exception to the charge of the court was directed.

It was shown, also, that down to the time of the commission of the homicide the prisoner was wholly destitute of pecuniary means. That the morning following the murder, or rather the same evening, he appeared at Schenectady, when he purchased and paid for an entire new suit of clothes; and on the evening of Saturday, the 17th of September, was seen to have in his pocket-book $1,020 or $1,040 in money. As to how he came by this sudden wealth he gave various accounts to different persons. There was no evidence, however, except of very inconclusive character, identifying any portion of the money in his possession as ever having been in the possession of the deceased. The proof on this point was this: On the afternoon of the 14th September Thompson exchanged some uncurrent funds at the banking house of Morford & Co. in New York, and received their check on the Park Bank for $750. This check was presented for payment on the morning of the 15th September by a person whom the teller of the bank did not know. The teller stated his impression that he paid the check in a $500 national bill, two $100 bills of the Park Bank and the rest in small bills, but had no recollection distinct from his impression as to the kind of money paid. About the 14th of October the prisoner purchased a pair of horses at Saratoga, and paid for them in part with two $100 bills of the Park Bank. This evidence failed to show that the $1,040 in the prisoner's possession immediately after the murder was the same description of money that the deceased had upon his person at the time of the murder. It showed, in connection with the evidence already referred to, the sudden change in the pecuniary con-

dition of the prisoner, at or about the time of the homicide, from extreme poverty and destitution to comparative afflu- ence and the possession of a very considerable sum of money; but nothing more. The prisoner offered no explanation of this change in his circumstances, nor did he attempt to show how or by what means he had suddenly acquired this sum of money. With this general view of the evidence we shall be able to estimate the force of the exceptions to the charge of the judge.

If we assume for the moment that the proof was not suffi- cient to establish the identity of the prisoner with the young man last seen with the deceased. Thompson on the night of the 16th of September, then there was clearly not proof enough to justify a conviction, for the whole fabric of cir- cumstantial evidence upon which the prosecution claimed a conviction fell to the ground. Until it was shown that the prisoner was in the immediate vicinity of the murder at the time it was effected, and thus had the opportunity to commit it, as the money could not be identified the material fact to authorize a conviction was wanting. But concede that the identity of the prisoner with the young man seen with Thompson at the time referred to, and the aspect of the case was changed, and the following fearful array of circum stances confronted the prisoner: 1st. The death of Thompson by violence by the gate opposite cattle yard No. 35, and the abstraction from his person of his pocket-book with a large sum of money. 2d. The last time Thompson was seen alive was in company with the prisoner at 20 minutes past 8 o'clock on the night of the murder. 3d. The prisoner's dis- appearance from West Albany, and his appearance at Sche- nectady the same night, where he purchased an entire new suit of clothes. 4th. His poverty and destitution for a long time before and up to the time of the murder, and his pos- session of $1,040 on the night after that event. 5th. His false representations as to the cattle he expected to come from Saratoga; his hiring cattle yard No. 35, which was in a lonely place remote from the tavern or hotel. 6th. His knowledge that Thompson had and carried upon his person at

the time a large sum of money; and his omission to show
where he received the $1,040, or to account for his changed
pecuniary condition. The whole case, it seems to me, de-
pended upon the question of the fact of the identity of the
prisoner with the man last seen with Owen Thompson, and
the existence of that fact was to be determined by the jury.
In the charge, after stating the conclusiveness of the proof
that Thompson came to his death by blows inflicted by some
person, and that the main question to try was whether the
prisoner inflicted the blows, the judge proceeded to say that
".although many facts were proved, there was little contra-
dictory evidence, and much of the testimony might be passed
over rapidly, and the mind directed to the main fact that
controls the case, viz.: Whether the prisoner was at West
Albany on the 16th of September." He then went over the
testimony given by the eight witnesses for the prosecution,
on the point of identity, with some particularity, and closed
the review in these words: " Is there any conflicting testi-
mony here upon this question of identity? Questions of
identity may be such as to require a very careful examina-
tion. But when it is in the power of a party, if he is not
the man, to show where he was on that day, at some time of
that whole day — the whole of Friday from 7 o'clock in the
morning until half-past 8 in the evening — he living here in
Albany, perfectly well known — living here for years, and
yet he gives no sort of evidence of any character or descrip-
tion to show that he was not the man, that which before
may have been regarded as highly probable ripens into cer-
tainty. If you believe, gentlemen, that this man living here
in the city of Albany, perfectly well known here, if he had
not been there on that Friday at all — that 16th day of Sep-
tember; if you believe that in that case he could have shown
.it by some witness, because the matter was soon called forth
into notice, it being only a month from the time of the mur-
der to the arrest; if he could have shown it by some witness,
and has not done it, what was before not absolute then ripens
into certainty." The counsel for the prisoner excepted, and
the exception was overruled.

In another part of the charge the judge reiterates the same proposition, and particularly in its application to the money seen in the prisoner's possession, in these words: "You perceive this is a case controlled by circumstances. If the prisoner was not at West Albany on the day of that transaction he has had abundant opportunity to show it. He might in that case have called witnesses to prove he was not there, but elsewhere on that day, but he has not done it. He has had abundant opportunity, also, of showing where he got that money, but he has not done it. Circumstantial evidence of this sort, when left unexplained, if in the power of the prisoner to explain if not true, becomes of a conclusive character." There was also an exception to this part of the charge. When the judge told the jury that if the prisoner was not at West Albany on the day of the murder, he had abundant opportunity to show it, and also that he had abundant opportunity of showing where he got the money. If he intended the jury to understand he had had an opportunity to examine witnesses on that point, it was well enough. But if he intended to be understood that it was in the power of the prisoner to show where he was and where he got the money, he assumed the existence of a fact which might be true, but which was not established by the evidence. But let that pass.

The points presented by the exceptions to the charge are not novel. They frequently arise in the trial of actions, both civil and criminal. A prisoner pressed by the force of accumulated circumstances may not unfrequently find himself in the position where he is required to account for his whereabouts on a given day, or to show how he became possessed of a given sum of money or article of personal property. The omission to produce such evidence has never been regarded as absolute and conclusive evidence of the fact in dispute. Neither the elementary writers nor the adjudicated cases furnish any such rule of evidence. The absence of such evidence, especially when it appears to be in the power of the prisoner to furnish it, creates a strong presumption of his guilt, a strong inference against him, and is a circum-

stance greatly corroborative of the truth of the evidence
given upon the other side.   In a doubtful case it would jus-
tify the jury in resolving the doubt against him.   To this
effect are the cases of *The People* v. *McWhorter* (4 Barb.
S. C., 438); *The People* v. *Bodine* (1 Denio, 281); *The
People* v. *Dyle* (21 N. Y., 578; *vide* also, 2 Stark., 6th
Am. ed., 685; 3 Black. Com., 371); *Braithwaite* v. *Coleman*
(4 Nev. & Man., 654).   We have been referred to no adjudi-
cated case where the judge upon the trial of a criminal
offense has instructed the jury that the absence of such proof
converts what was before not absolute, but only inferential
and circumstantial, into that which is certain and conclusive,
and which instruction has been affirmed by the court in
bank.   Such a rule is unnatural and illogical, and fatal alike
to innocence and to guilt.   It is easy to imagine a case
where it would be impossible for a prisoner upon his trial to
show his whereabouts on a given day, and a case also where
he is guiltless of the crime charged, and where prudence and
safety in regard to other transactions might induce silence
and suppression of the evidence of his presence or absence,
as the case might be.   But the rule which treats the omis-
sion to produce such evidence, as strongly corroborative, as
strongly suspicious and inferential only, is reasonable as well
as humane, and a safer and surer guide to a just result.
When the learned judge, therefore, instructed the jury that
Gordon's omission to show where he was on Friday, the 16th
of September, rendered what was before not absolute into
certainty, and that the circumstances given in evidence upon
the trial unexplained (if in the power of the prisoner to
explain) became of a conclusive character, we think he went
further than the law of evidence will justify, and committed
an error which might prejudice the prisoner.   It was in
effect saying that there was no longer any room for doubt or
hesitation, for the terms certainty and conclusiveness can
mean nothing less.   In their application to the weight of
evidence, they import little less than absolute verity.   The
law attributes no such consequences to the omission of a
prisoner upon the trial of a capital offense to produce proof of

his whereabouts upon the day when the crime charged was committed.

There is no line of distinction better defined in the constitution of our courts of criminal jurisdiction than that which separates the province of the court from that of the jury. *Ad questionem juris respondeant judices, ad questionem facti respondeant juratores,* is the law maxim which defines the line of separation. An intelligent and conscientious jury will look to the court, in the trial of a capital case, with confidence and reliance, for instruction and guidance as to the law of the case, and all things exclusively within his province. In addition to their obligation to accept the law as he pronounces it, they naturally trust to his superior knowledge and his larger experience. It was a part of the duty of the judge, in this instance, to speak to the jury upon the character and force of the evidence given upon the trial, and specially to direct their attention to the circumstances upon which the prosecution relied, in their due order and connection with one another and with the prisoner, and the degree of weight to be given to each particular circumstance. This was done, with a method and perspicuity seldom surpassed. Nothing, however, can be plainer and more indisputable, I think, than the proposition that the identity of the prisoner with the young man in company with the deceased Thompson on the night of the murder was a question not within the province of the court. It was one upon which it could utter no response and make no determination. It was a question addressed exclusively to the jury, to be answered by them upon their own responsibility, and also upon the proofs and circumstances adduced by the prosecution, and also upon those which the prisoner, in the nature of things, might have adduced, but did not. To hold otherwise would be to disregard a fundamental principle which obtains in the organization of the common law courts, and deprive the trial by jury of its principal virtue. When the jury were therefore told from the bench that the absence of the proof referred to (if it was in the power of the prisoner to produce it), rendered the evidence given by the prosecution upon the

principal question certain and conclusive, there was nothing upon that point left for them to determine. For if the instruction given from the bench was right, the law had already determined it for them. They could have regarded it in no other way; and, accepting the evidence in the sense of certainty and conclusiveness, they decided the question of identity against the prisoner.

The judgment of the Supreme Court and the Court of Oyer and Terminer should be reversed, and a new trial ordered.

All the judges concurred, except PORTER, J., who took no part in the decision, and CAMPBELL, J., who dissented.

CAMPBELL, J. The prisoner, George E. Gordon, was indicted for the murder of one Owen Thompson. He was tried and convicted at the Albany County Oyer and Terminer, in December, 1864, and sentenced to be hung on the 16th February following. The murder was committed at West Albany some time during the night of the 16th September, 1864.

On the trial a juror was challenged for favor by the district attorney, and on his examination under oath stated that he had conscientious scruples against rendering a verdict of guilty when the penalty was death. On a cross-examination he added that his scruples were more of a political character against the policy of capital punishment than of a conscientious or religious character, and if the evidence proved a person guilty he would have to be guided by his oath and so decide; but on a further direct examination he said that he "could not say whether his views would allow him to find a verdict of guilty when the penalty was death." The counsel for the prisoner asked the court to decide that the scruples or opinions of the juror were not cause of challenge to the favor, and there was a refusal and exception, and the triers found the juror not indifferent, and he was set aside.

I do not think there was any ground for complaint on the part of the prisoner. If there had been a challenge for principal cause it would have been the duty of the court to reject

the juror. (See *The People* v. *Walter*, 32 N. Y., 147), where the views of the witness were very similar, and he was set aside by the court on its own motion. The prisoner could not complain, therefore, when he had the still further advantage given to him of going before the triers on the question of fact as to bias. In the case of *The People* v. *Lowenberg* (5 Park. Cr., 414), the same question was put and answered where the challenge was to the favor, and though exceptions were taken, the decision seems to have passed unchallenged through the Supreme Court and this court. It is very manifest that the juror was not competent, and was rightly excluded. The prisoner was entitled to a jury of twelve men, not of his own selection, but impartial jurors, indifferent between the people and the prisoner. This juror did not belong to that class. He had doubts, scruples, partly conscientious, partly political, and could not say whether or not his views would allow him to find a verdict of guilty when the penalty was death. I am inclined to think that the challenge to the favor was right. But in any event the prisoner was not wronged, or if the challenge had been for principal cause the result would have been the same. The murdered man was last seen alive about 8 o'clock in the evening of the 16th of September. At that time, a young man was with him who had been in his company during a considerable part of the day, and who had proposed to sell to the deceased, who was a drover, some cattle which he said he expected to arrive that day from Saratoga county. An important question arose whether that young man was the prisoner then on trial for the murder. Passing over, for the present, the evidence as to his identity derived from the testimony of the witnesses who were present at West Albany on that day, and saw this young man in company with the deceased, let us refer to other facts bearing on the question. The young man's clothes worn on that day corresponded with the clothes worn by the prisoner up to a very short period before the murder. The young man had a slight dark or brown moustache; so has the prisoner. The young man had several defective or diseased front teeth; so had the prisoner.

About midnight the prisoner made his appearance at Schenectady, and on the morning of the next day he purchased a new suit of clothes in that city, and engaged a man to carry him to Saratoga county, where he had relatives living, and thenceforward, for some time, his movements are all detailed with more or less minuteness. He was arrested at Schenectady about a month after the murder. Prior to the murder he had been at times in Albany, and in East Albany, and in Greenbush, the latter place being the residence of his father and father-in-law, and where his wife resided with her father, it appearing, however, that he did not live with her at the time. Eight or nine witnesses who were present at West Albany on the 16th of September, and saw the young man in company with the deceased, and some of whom were in conversation with both of them, and paid particular attention to the young man's appearance, were sworn as to the identity of the prisoner. Some stated that to the best of their judgment the prisoner was that young man, while others stated unqualifiedly that the prisoner was the man. The prisoner called no witnesses, and offered no proof to show where he was on the 16th of September. With such evidence bearing on the question the judge charged the jury as follows: "Questions of identity may be such as to require very careful examination. But when it is in the power of the party, if he is not the man, to show where he was on that day, at some time of that whole day, the whole of Friday from seven o'clock in the morning until half-past eight in the evening, he living here in Albany, perfectly well known, living here for years, and yet he gives no sort of evidence of any character or description to show that he was not the man, that which before may have been regarded as highly probable, ripens into certainty. The exception was in these words: "The counsel for the prisoner excepted to all that part of the charge which states that the neglect of the prisoner, under the circumstances stated, to prove where he was on the 16th day of September, 1864, ripens into certainty that the prisoner was at West Albany on that day."

But, referring again to the charge, it is seen that the judge

followed up the preceding statement by explaining to the jury exactly what he intended, and how they were to be governed by it. He added at once, "*If you believe*, gentlemen, that this man, living here in the city of Albany, perfectly well known here, if he had not been there on that Friday at all, that 16th day of September, *if you believe* that in that case *he could have shown it by some witness*, it being only a month from the time of the murder to the arrest, if he could have shown it by some witness and has not done it, what was not before absolute then ripens into certainty." Taking the whole charge together, so far as it refers to the question then under consideration, I think it was right. The first proposition, if too general, was qualified by the direct instruction given to the jury. They had seen and heard all the witnesses, were familiar with the evidence, and if they believed that it was in the power of the prisoner to have shown where he was, and he had not done it, then what was before not certain, became so. In other words, if there was doubt before, doubt had been removed by the prisoner's silence. In the language of Beccaria, "Imperfect proofs of which the accused, if innocent, might clear himself become perfect." (See Cowen & Hill's Notes, 310, and cases cited.) The charge would have been right if the evidence had been circumstantial, and in that view was more favorable to the prisoner than he could have required. It was a simple question of fact whether the prisoner was at West Albany on the 16th of September in company with the murdered man. It did not establish the guilt of the prisoner, but it was a fact having a strong tendency in that direction. The fact that he was there, was established by positive proof. It is well said by Starkie (1 Stark. Ev., § 24), that "the highest degree of certainty of which the mind is capable, with respect to the existence of a particular fact, consists in the knowledge of the fact derived from actual perception of the fact by the senses." The prisoner was identified by a number of persons, some of whom had long conversations with him on that day, and who, though they did not know his name, may be said in a certain sense to have thus become acquainted

with him. They knew his form, his voice and his appearance, his features and expressions. The perception of the fact was by their senses, and they testified, positively, that the prisoner was there. There was no denial or contradiction by any witness or evidence offered by the prisoner. In judgment of law, the fact was proved. The judge might have assumed it in his charge to the jury, might have said to them that the fact was proved by the uncontradicted testimony of men who saw him there. The first proposition in the charge was only to the effect that the prisoner was there. The qualification or direct instruction to the jury implied a doubt, and the benefit of it was given to the prisoner. It probably did not avail much from the pointed manner in which the instruction was given, but there was no error prejudicial to the prisoner, because the direct proof was positive, and in judgment of law rendered it certain that the prisoner was there; that he was the young man in company with the deceased on the day preceding his death.

There was another exception, as follows : " The counsel for the prisoner also excepted to that part of the charge relating to the neglect to prove where he got the money; that circumstantial evidence of this sort, in the language of the law, when left unexplained, becomes of a conclusive character." The part of the charge which I suppose the counsel referred to was in this language : " He has had abundant opportunity also of showing where he got that money; but he has not done it. Circumstantial evidence of this sort, when left unexplained, *if in the power of the prisoner to explain, if yet not true,* becomes of a conclusive character." The judge, in another part of his charge, had said : " It appears from his statements, contradictory to each other, that he attempted to show that he got his money by recruiting; and yet *it is for you to say* why he has not offered some proof on the subject, or why, at least, he has not enabled his counsel to state how and where he got this money. He had not been to Rochester or Buffalo, or remote parts of the State. If he had obtained any recruits, here is the place to call his witnesses; but not one man is called." The murdered man, on the day preced-

ing his death, had a considerable sum of money about his person. When his body is found the next morning, the money is gone. The prisoner was in company with him. Up to that time the prisoner was out of employment and in very low circumstances. On the day following the murder, the prisoner is found in possession of more than a thousand dollars, which he proceeds to expend freely in the purchase of clothes, horses, and in traveling about the country. He makes various and contradictory statements as to the amount of money which he has in possession, and how he obtained it. On his trial, he offers no evidence on the subject. The people call and examine several witnesses, showing by them his previous pecuniary condition, and his sudden possession of what, to a man in his condition, was a large sum of money. Evidence is also given tending to show that this money corresponded in amount and character with the money which the murdered man had with him on the day of his death. The questions involved were, where did the prisoner obtain the money? was it the money of the murdered man? It was not the question of the guilt of the prisoner. If the money was that which the murdered man had on the day of his death, the fact would tend strongly to establish the issue then on trial against the prisoner. But it was but one fact or circumstance, and, standing alone, might be consistent with the innocence of the prisoner. As the evidence stood at the close of the trial, the people had given sufficient to show presumptively that the money was that of the murdered man. The judge was right, then, in saying to the jury that circumstantial evidence of the kind that had been given, becomes of a conclusive character, if the prisoner had it in his power to explain, and yet offered no explanation. The opportunity was afforded to the prisoner by his trial, and his attention very distinctly called to the subject. If the jury should be of opinion that the prisoner had it in his power to explain, if not true, and makes no explanation, then the fact might be considered as conclusively proven, that the money in the prisoner's possession was money previously belonging to the murdered man. That was, substantially,

the charge, taken together, so far as relates to the possession of the money, and, I think, was right, and the exception not well taken.

The act of 1862 expressly repeals the act of 1860; and by the former act (1862), and under which the prisoner was tried, the jury are not required to find whether the offense is murder in the first or second degree. I suppose, if a prisoner claims that, if guilty, the offense is only that of murder in the second degree, he must ask that instruction be given to the jury the same as in case of manslaughter. In this case, all the counts charged substantially the offense of murder in the first degree, and the verdict of guilty, as charged, was right. But if some of the counts had charged the crime in the first degree, and others had charged a lesser crime, still a general verdict would have authorized a sentence for the higher offense. (*Conkey* v. *The People*, decided in this court, and reported in 5 Parker, 31.)

The motion in arrest of judgment was properly denied, and the judgment of the Supreme Court should be affirmed.

Judgment reversed.