(20 App. Div. 139.)

PEOPLE v. FITZGERALD.

(Supreme. Court, Appellate Division, Fourth Department. July 29, 1897.)

1. ARSON—CONSPIRACY—EVIDENCE.
    On a trial for arson by burning a parochial school building, where it was the theory of the prosecution that the crime was the result of a conspiracy between defendant and two servants in his employ, and was committed for the purpose of realizing, by means of the insurance thereon, funds to relieve him from financial embarrassments in which he was involved as pastor, evidence that defendant had become the owner of numerous parcels of real estate, and had taken the title thereto in the names of such servants, without any consideration on their part, and in some instances without their knowledge, and evidence of their doings both before and after the fire, was properly received for the purpose of establishing confidential relations between the parties.

2. SAME—MOTIVE—EVIDENCE.
    The fact that defendant was insolvent at the time of the fire was pertinent.

3. SAME.
    Evidence that the defendant's relation with the sisters in charge of the school had become disturbed was properly received, as bearing on the question of the probable continuance of his pastoral relations.

4. SAME—SUFFICIENCY OF EVIDENCE.
    Defendant obtained insurance on the property burned, a few days before the fire, in an amount largely in excess of its value, and procured a company to give an entertainment in such building; otherwise there would have been no occasion for using fire in it. He then left for another city. His servant, who had the keys to the building, and was the last one to leave it after the entertainment, was thereafter seen to leave defendant's residence, and go in the direction of the building, and, after the fire was discovered, was seen to leave the building, and return to defendant's house, and a police officer, who followed him into the house, was impeded by another servant. Between these servants and defendant confidential relations existed. *Held*, that a finding that the fire was set by the servant first mentioned was supported.

5. SAME—PROVINCE OF JURY.
    Where no evidence was given to show why defendant was absent on the night of the entertainment, beyond that furnished by his purchase of laundry supplies in the city to which he went, and while he was absent he sent to the servant in charge of his house a telegram directing her to have the other servant "close all doors and lights out after entertainment," for which no explanation was offered, it was for the jury to determine what inference should be deduced from such facts and circumstances.

6. SAME—RES GESTÆ.
    Testimony by the officer that followed the servant into defendant's house, respecting the appearance of the servant that interfered. with him, was part of the res gestæ.

7. SAME—EVIDENCE—HARMLESS ERROR.
    It was not reversible error to receive testimony of the manager of such entertainment to the effect that after it closed he went to defendant's house,.

and was informed by the servant that defendant was not expected home that night.

**8. SAME—EVIDENCE—RELEVANCY.**

Nor was it error to receive testimony of the servant by whom the fire was claimed to have been set, respecting his whereabouts on portions of the night of the fire.

**9. SAME.**

There was no error in receiving the testimony of certain insurance agents to the effect that they had declined, under instructions, to write insurance on property in defendant's name.

**10. SAME.**

It was competent for a mortgagee to testify that defendant had told him, on the cancellation of certain policies, that he had effected insurance in the name of his servant, to whom the property had been conveyed.

**11. SAME.**

It was not error to permit an insurance adjuster to testify that defendant claimed that the insurance money should be paid to him, and that it should not be paid to the bishop; and that he stated that he "was willing to sacrifice a little of it if they would make a settlement with him then and there."

**12. SAME.**

Nor to permit the two co-trustees of defendant to testify that they had no part in obtaining the insurance just previous to the fire.

**13. SAME.**

A conversation between the bishop and defendant, a few days before the fire, was competent as tending to elucidate the relations existing between defendant and his church and its superior officers, and to develop the fact that his affairs had reached a crisis, and to indicate the motives of his conduct succeeding such interview, where it related to a letter which the bishop had written him, rebuking him for "public drunkenness," and intimating that he should be removed; and also the letter referred to in such conversation.

**14. FAILURE TO TESTIFY—INSTRUCTIONS.**

Where defendant, after appearing voluntarily before the grand jury, did not testify as a witness at the trial, an instruction that the jury were not to assume that he would deny or admit any of the evidence, but should consider the evidence as it stands, unaffected by the fact that defendant did not take the stand, was proper, under Code Cr. Proc. § 393, which declares that a defendant's neglect or refusal to testify does not create any presumption against him.

Appeal from Monroe county court.

John M. Fitzgerald was convicted of arson in the second degree, and from a judgment of conviction, and from an order denying his motion for a new trial, defendant appeals. Affirmed.

The bill of exceptions contains all of the evidence given upon the trial, as well as the exhibits set out at length. In the oyer and terminer of Monroe county an indictment was found charging the defendant with the crime of arson in the first degree, and contains the following language: "That the said John M. Fitzgerald, on the 17th day of July, in the year of our Lord one thousand eight hundred and ninety-five, at the village of Charlotte, in this county, with force and arms, in the nighttime of said day, unlawfully, feloniously, willfully, and maliciously did set fire to and burn the parochial school building of the Holy Cross Church, Charlotte, a corporation duly organized, existing, and doing business under and by virtue of the laws of the state of New York, then and there situate, and there being then and there within said parochial school building at the time a human being, to wit, James Moran, known to the said John M. Fitzgerald to be within the said building at the time; contrary to the form of the statute in such cases made and provided, and against the peace of the people of the state of New York, and their dignity." After a very protracted trial, the jury found a verdict of "guilty of arson in the second degree, and recommended mercy." The defendant was sentenced to the state prison at Auburn for the term of 10 years on the 8th day of February, 1896, and a judgment to that effect was entered in accordance

with the provisions of law. Before the judgment was entered, a motion for a new trial upon the ground that the verdict was contrary to law, and upon several other grounds, was made and denied.

Argued before HARDIN, P. J., and ADAMS, GREEN, and WARD, JJ.

D. N. Salisbury, for appellant.
George D. Forsyth, Dist. Atty., for the People.

HARDIN, P. J. In July, 1895, there existed at Charlotte a corporation known as the Holy Cross Church, having in its possession several buildings, among others the one mentioned in the indictment, and known as the "Parochial School Building." Near to that building was a residence occupied by the defendant, who, since 1881, was pastor in charge of the affairs of such corporation, and had been its treasurer, and a member of its board of trustees, which also had two lay members. To sustain the indictment, the people gave no evidence to show that the defendant personally set the building in question on fire, but the theory of the people was that the defendant used as instruments to accomplish the burning of the building two servants in his employ for some time antecedent to the fire. His housekeeper was Nora Cronin, and her brother, John Cronin, was a hired man also in the service of the defendant, and had been for some time prior to the fire; and it was claimed that there was a conspiracy between the defendant and them to commit the crime, and that the defendant, by means thereof, sought to acquire the insurance moneys which might be realized upon policies of insurance which he had caused to be issued upon the building destroyed, and the contents thereof; and that his relations had become so embarrassed with regard to the church and the sisters and with the bishop that he expected to be removed from his position as pastor of the church, and that he sought, before such removal, to obtain the insurance money with a view of liquidating any indebtedness on the part of the church to him, and with a view of relieving him from financial embarrassments which then surrounded him. To sustain the theory of the prosecution, evidence was given of many circumstances claimed to support it. Close and confidential relations existing between the defendant and the Cronins were shown by many facts and circumstances legitimately tending to show that there was great confidence between the defendant and each of the Cronins who were in his employ. The defendant had become the owner of numerous parcels of real estate, and had taken title thereto in John Cronin without Cronin's advancing any consideration therefor, or having executed any written evidence in respect to the title so received by him. Some of the real estate was put in Cronin's name without any consideration passing from him, and without any immediate personal knowledge of the same. Several parcels of real estate the defendant had caused to be conveyed to Nora Cronin. With a view of establishing the relations between the defendant and the Cronins, we think the evidence was properly received of their dealings and of their doings antecedent to and subsequent to the fire.

In the course of the evidence in respect to the defendant's real estate it appeared that he had become the owner of numerous lots in Charlotte and some in the city of Rochester, some of which were mortgaged, and some of which were taken in his name and others in the name of the servants already mentioned; and, apparently, the whole volume of evidence upon the subject of his transactions in real estate justified the conclusion that the real estate owned by him in July, 1895, was valued at about $38,000 to $39,000, and that the same was incumbered by mortgages for the sum of $44,697. Notwithstanding the objections made by the defendant, we think the evidence of his insolvency in July, 1895, was pertinent. We are also of the opinion that the facts that the affairs of the parish school were conducted by three sisters under the supervision of the defendant, and that the relations existing between the defendant and the sisters had become somewhat strained and disturbed, were proper evidence to be received with a view of determining the probable continuance of the defendant in his relation to the church property.

Evidence was given tending to show that in December, 1892, a policy of insurance on the building burned was issued by the Home Insurance Company for $1,500, and that just before the fire occurred, to wit, on the 10th of July, 1895, the defendant caused to be issued, without the knowledge of the other trustees, two policies of $1,500 each, making a total of $4,500 upon the building, and also a policy of $1,400 upon the furniture and fixtures and $500 upon other property,— "sash, doors, and blinds in the building." Evidence was given to show that the building was not worth, at the time of the fire, to exceed $3,300. There was some evidence tending to show that the property stored in the school building consisting of sash, doors, and blinds was the property of the defendant, and that he caused the insurance to be taken in the name of the church society because of some difficulty that he had theretofore experienced in obtaining insurance upon property owned by him; and there was evidence tending to show that, with a view of obtaining such insurance upon the sash, blinds, etc., the defendant had assumed to give the property to the church. The sash and blinds seemed to be an accumulation of property obtained from other buildings; and there was some evidence tending to show that it belonged to the defendant, who had been engaged in building houses himself, and in that business had accumulated the odds and ends which were covered by the $500 policy. The evidence tended to show that on the 10th of July the defendant entered the office of Zimmer, an insurance agent in the city of Rochester, and obtained a policy for $1,500 on the school building and $1,400 upon the school furniture and $500 upon the sash, doors, and blinds. He did not then disclose to the agent that there was at that time $1,500 on the building in the Home Insurance Company. On the same day the defendant went to Vay, another insurance agent, having an office in the Powers Block, Rochester, and procured a policy upon the school building for $1,500. Nor did he disclose to Vay that he had solicited through Zimmer $1,500 upon the building and $1,400 upon the furniture and fixtures and $500 upon the sash, doors, and blinds. The policy of insurance which he obtained from the agent

Vay did not contain a permit for other insurance. However, on the morning of the 16th of July, the defendant sent Nora Cronin to the office of Vay with the policy, and she reported to the agent that the defendant had sent her there to have the words, "Other insurance permitted," inserted in the policy. She reached Vay's office about 11 o'clock in the forenoon of the 16th of July, and, after the words were inserted, she returned to Charlotte. The evidence tended to show that the defendant, on the morning of the 16th about 9 o'clock, learned from Schwartz, the New York Central Railroad agent, that he could find a train at Rochester, and reach Troy, if he left Rochester at 10 o'clock; and, after obtaining that information, defendant returned to his house, and with his satchel in his hand took an electric car for the city of Rochester. Shortly after, Nora Cronin took another car, and followed to the city of Rochester. Before the defendant left Charlotte, he had perfected an arrangement to have an entertainment take place in the school building that night; and, in the absence of that entertainment, it was suggested by the evidence that no fire was in use in the building, as there had been no school after the 17th of June. The entertainment arranged for was to be given by the Ellises, itinerant show people, who were accustomed to engagements at the Bartholomay Pavilion, a sort of a summer garden, and they occupied one of defendant's houses, and he had arranged with them to give an entertainment in the school house, which arrangement was made the Monday before the entertainment. It seems that the Ellises had procured a definite arrangement with the Bartholomay people, and they sought to give up the appointment in the school house, and when they communicated that fact to the defendant he seemed to be disturbed by it, and became agitated, and threatened to denounce them in the public prints if they did not keep their engagement with him. It was finally arranged that they should give an entertainment after the one closed at the pavilion, and after 10 o'clock at night. In pursuance thereof, the Ellises gave the entertainment at the school, and the same was not concluded until 11:30 p. m., or about midnight. According to the evidence, the defendant went, on the 16th of July, to Troy, and there made a purchase of laundry machinery, making a bill to the extent of some $1,167. There was evidence given tending to show that he was then insolvent, and that there were executions outstanding against him.

Evidence was given tending to indicate clearly and directly that John Cronin set the fire that consumed the school house building some time near 2 o'clock in the morning of the 17th of July. Cronin had the keys to the school house, and had charge of it, and on the night of the entertainment he was the last one who left the building, at about the hour of 12 o'clock. The evidence discloses that by reason of certain circumstances that had transpired one Dennis and others undertook to watch the school house building on the night of the 16th, and that Dennis saw John Cronin come out from the parochial residence, and go in the direction of the school house, passing in the path between the sisters' house and the school house on the south side. Dennis was a police officer, and he watched the school house, and saw the blaze therefrom, and shortly thereafter saw a man dash

out from the west end of the school house, and Dennis called to him to halt, in a loud voice, and gave chase to the man.    The man ran at full speed into the defendant's house, entering the kitchen door, with the officer in close pursuit at a distance of six or eight feet, and when the officer entered the room Nora Cronin stood by the dining room door, dressed in her usual apparel, with her hair done up, and with an ordinary kerosene lamp in her hand, lit; and the officer was, by means of that light, enabled to identify John Cronin.    Nora then caught hold of the officer, and blew out the light, and placed herself between the officer and the door through which John Cronin went, and the officer ordered her to stand back, and he called out to his assistants to "come on, boys."    Thereupon Keon and Wickham, who, pursuant to an arrangement entered into between them and Dennis to watch on that night, started to run from the points where they were stationed, and Keon entered the house and Wickham went to the front door.    A light was struck, and search made of the house, Nora Cronin following them through the house.    They attempted to take down the front hall light, and then and there Nora Cronin attempted to blow out that lamp.    They made a search of the house, and did not find John Cronin therein.    When he entered the house he had no hat on, and, apparently, had no shoes on.    When Cronin was subsequently arrested, and taken to the lockup, he procured a hat and shoes from the defendant's house, and gave up those that he then had, as they did not fit him.    The circumstances of discovering the fire and of the presence of John Cronin, as detailed by Dennis, are, to some extent, corroborated by the witness Wickham; and the testimony of Sister Edwards and of Sister Mary Joseph tends to corroborate the testimony of Dennis.    The testimony of Dennis, although attacked severely by cross-examination and otherwise by the defendant, supported as it was by the testimony of witnesses we have already mentioned, and by the circumstances disclosed in the evidence, presented a question of fact for the jury to determine, and supported a finding made by the jury to the effect that the fire was set by John Cronin under the circumstances narrated by the witness Dennis.    It appeared by the evidence that John Cronin absconded, and was not arrested until the 18th of July.    The evidence indicated that before Cronin was arrested the defendant made some contradictory statements in respect to his whereabouts, and in his efforts to account for his absence.    After the people had given all of the facts and circumstances that related to the actual occurrence of the fire, and the circumstances relating to the departure of the defendant from Charlotte on the morning of the 16th, they placed in evidence a telegram, which was prepared by the defendant while en route to Troy and it is of so great importance in the link of evidence that is relied upon by the people to establish the guilt of the defendant that the same is here produced.    The language of the telegram is as follows:

"Syracuse, N. Y., July 16, 1895.

"Miss Nora Cronin (care of Father Fitzgerald, Charlotte, N. Y.): Tell Mr. Ellis I was called away suddenly. Return, if possible, to-night. Have Johnnie close all doors and lights out after entertainment. Many tramps now in Charlotte. Use your own best judgment.    John M. Fitzgerald."

46 N.Y.S.—65

The telegram, apparently, was written upon a scrap of paper, and pasted upon a blank of the telegraph company. The message was delivered to Nora Cronin, and the circumstances attending its delivery, and the knowledge thereof of John Cronin, are referred to in the evidence somewhat in detail. The defendant returned to Charlotte on the 17th, and a newspaper reporter by the name of Otis interviewed him in respect to the circumstances of the fire. Thereupon the defendant stated to Otis that he had sent a telegram to Nora, and the nature and character of it. In speaking of that interview, Otis testified, viz.:

"He said: 'Otis, I have something to show you. I want to know what you think of it. Something I treasure very much,'—or something of that sort. The exact words I cannot remember. He took from his pocket a telegram and a letter. He showed me the telegram, he taking hold of it by one hand and I the other. To the best of my recollection, it was dated Syracuse, and was addressed to Nora Cronin, and said, 'Be sure and put out all the lights, as the village is infested by tramps.' The letter was in typewriter, and was a schedule or bill of laundry machinery. * * * He said he had received this bill at Troy, and he said, to the best of my recollection, that he was nervous about the entertainment, and had got off the train at Syracuse, and had sent this telegram to Nora. He asked me what I thought about these things; asked if I did not think it would be an awfully good idea to keep these in his possession to keep to show. I asked if he really wanted my advice about it, and he said he did, and I said if I was him I would not show them to anybody else, but put them in my pocket, and keep them; not to holler before he was hurt; that he might show them to his attorney, and get his advice."

In the course of the charge delivered by the learned trial judge he carefully and cautiously submitted to the jury the language of the telegram, and commented upon the significance that should be given to it in connection with the other circumstances in the case, and confided the whole circumstances to the jury to determine therefrom what inferences should be deduced, and what force and effect the language of the telegram, which has been quoted, should receive. No evidence was given tending to show why the defendant was absent the night of the entertainment beyond such as is furnished by the purchase of the laundry supplies, and no reason is offered in explanation of the telegram sent to Nora two or three hours after parting with her. In Gordon v. People, 33 N. Y. 501, it was said:

"The absence of an attempt to account for his whereabouts, when it appears to be in the power of the prisoner to do so, is strong presumptive evidence against him. But the force of such circumstance must be left for the consideration of the jury; and it is error for the court to instruct them that it is of a 'conclusive character' or that, by such omission, doubtful evidence of guilt 'ripens into certainty.'"

In respect to the evidence which we have adverted to, as well as many other circumstances which have not been enumerated, the learned trial judge instructed the jury in accordance with the doctrine of the case from which we have quoted.

In Schwier v. Railroad Co., 90 N. Y. 558, it appeared that there was an omission to call a witness, and Danforth, J., said that omission "is not evidence against the defendant of the existence of any fact. It is cause for taking such testimony as is in the case—and which, if untrue, he might have contradicted or explained—most strongly

against it." That case was followed in Kenyon v. Kenyon, 88 Hun, 214, 34 N. Y. Supp. 720. The same doctrine was laid down in People v. Hovey, 92 N. Y. 554, in which latter case it was said: "A jury would have the right to infer that the evidence of an eyewitness to a transaction would not be favorable to a party who voluntarily excluded such witness from testifying in the case." And in Byrne v. Railroad Co., 26 N. Y. Supp. 760, it was said: "A weak case for plaintiff is made strong when a witness who could contradict it is not called by the defendant." The rules thus laid down in the cases to which we have just adverted were observed with great faithfulness by the learned trial judge in the course of his charge to the jury.

When Dennis, a witness sworn in behalf of the prosecution, was describing the circumstances of discovering a man going to the building just before the fire broke out, he said:

"I was watching the school house, and all at once I seen a light in the basement of the school house, and in a very short time a man dashed out from the direction of the west end of the school house. He was running, and I hollered 'Halt!' and ran after him, and I ran him into Father Fitzgerald's house. He went in the kitchen door, and as I opened it he was going through another door. The man I chased into the house was John Cronin. I have no doubt upon that subject. There was a light in there. Nora Cronin was there, standing in the dining room door, with a lamp in her hand."

When the witness was asked to "describe her appearance" objections were interposed by the defendant to the effect that the evidence was immaterial and incompetent, and the objections were overruled, and an exception was taken. The witness answered:

"She was dressed in ordinary clothes, the same as women use generally in the house. Her hair was done up the same as if she had been to work. I went up to her, and took the lamp out of her hand. (Defendant objected to the proof of anything that took place between the witness and Nora Cronin as incompetent.)"

The court, in announcing his ruling said that he should receive "as much of the transaction as seems to me to be clearly a part of the res gestæ in regard to the flight of John Cronin. Of course, that must not be extended too far; but the moment Mr. Dennis rushes into the kitchen, and John Cronin leaves by another door, he following, and Nora Cronin interferes, it seems to me it is a part of the res gestæ, and competent for that reason." The defendant took an exception to the ruling. We think the exception presents no error.

When Frank Ellis, the theatrical performer, was upon the stand, he stated the circumstances relating to the entertainment, and that it closed about half past 11, and the departure of the audience, and that thereupon he went to the house of the defendant, and saw Nora, and had a talk with her; and when he was asked to state it objections were taken that it was incompetent and immaterial. The objections were overruled, and an exception was taken. The witness said:

"I saw Nora. I said, 'Nora, is Father John home?' She says, 'No.' I says, 'Do you think he will be home to night?' She says, 'I do not think he will.' I asked Nora if she had received a telegram. She said, 'No.' I asked her if she received a telegram for me. I believe that was the question."

We think no prejudicial error was committed in receiving the evidence. There was no motion made to strike out the evidence at the close of the case. Place v. Minster, 65 N. Y. 106.

We do not think it was error to receive the testimony of John Cronin as to his whereabouts portions of the night of the 16th of July. He was asked to state whether, before he went to O'Brien's on the 16th, or the morning of the 17th, he heard the fire bells ring. That question was objected to by the defendant, and the witness answered, "Yes, sir," and he added that before he went to O'Brien's that night he saw a hose cart on Light House avenue. We think the exception presents no error.

The testimony of Wolf, the bookkeeper of Zimmer, the insurance agent, fully describes the circumstances attending the application, on the 10th of July, 1895, for policies of insurance of $1,500 on the building, and $1,400 on the school house furniture and fixtures, and $500 on the building material in the basement. The witness was allowed to testify that certain cancellations of policies obtained in that agency theretofore had taken place, and the knowledge of the defendant in respect to the cancellation of policies issued to the defendant; and in the cross-examination the witness was asked in respect to his hesitation about issuing policies on the 10th of July, and the fact was drawn out from the witness that the policies then applied for "were not taken out in the name of" the defendant. The witness was then asked, "What was the hesitation on the 10th of July?" This question was objected to by the defendant as incompetent and immaterial, and the objections were overruled, and an exception was taken. The only answer the witness made was, "I referred the risk to Mr. Zimmer first, to see whether he would carry it." The witness then refers to an interview he had with Zimmer, and thereafter he was asked, "Why did you hesitate?" That question was again objected to, and an exception taken, and the witness was allowed to answer as follows:

"Well, I wanted to get Mr. Zimmer's opinion first as to whether he would carry it. I knew they wouldn't carry any insurance in Father Fitzgerald's name, and I thought perhaps he would write it in that shape; and that was the cause of the hesitation."

We think the exception presents no error. Blumenthal v. Bloomingdale, 100 N. Y. 562, 3 N. E. 292; Simmons v. Havens, 101 N. Y. 428, 5 N. E. 73.

Zimmer, the insurance agent, was called, and testified to some of the circumstances attending the issuing of the policies on the 10th of July, 1895, and to a conversation had with the defendant, and then he referred to certain letters he had received from the insurance companies subsequently, and to a conversation he had with the defendant on the 15th of July; and when the witness was asked what was said on the subject to defendant there were objections made and overruled, and exception taken, and the witness answered, viz.:

"I told him we had notice from the Rochester Insurance Company that we must cancel. He asked me at that time for a vacancy permit, and this answer came from the insurance company that we must not grant any more permits to Father Fitzgerald. Also insure nothing in Charlotte, especially on Father Fitzgerald's

property. That is what I told Father Fitzgerald. * * * Told him that these companies objected to insuring any more property for him or in his name. * * *"

We think the exception presents no error.

The conversation which Van Valkenburg, the general agent of one of the insurance companies, held with the defendant, in which the witness stated, viz.:

"I told him previously we had forbidden our agents to insure property he had anything to do with. He asked why. I told him he had had altogether too many fires, and that the property he had lost by fire was always insured for more than it was worth, and I thought we had sufficient experience with him to justify us in letting his business alone. He wanted to know how many fires he had had, and I stated to him, first, there was a church, an old church used as a school house, in 1882,—in the fall of 1882 or the winter of 1882, I think. Then there was a house or two, and a barn, and a shoe factory, and a hotel. He asked me if we had been interested in all of them. I told him I thought not quite all, but had our share. I told him I could not state definitely quite all, but I recollect several. He asked me if I meant to insinuate that there was anything wrong about those fires,—anything of a criminal nature to them. I told him I did not mean to intimate anything, just stated facts. That was the occasion on which he said the money was his, and he would have it. He said that insurance belonged to him, and he was going to have it."

This testimony was received without objection being taken thereto by the defendant.

The witness Miller was called to prove that he held a mortgage on a certain piece of real estate, and he detailed a conversation which he had with the defendant to the effect that certain policies of insurance had been canceled, and that an insurance was effected in the name of John Cronin, to whom a deed had been given of the property. The witness added:

"I had endeavored and he had endeavored to effect insurance upon this property, and he said he would have the property transferred to some one else, in order to effect the insurance. He mentioned in that connection Nora Cronin and some party, I think Jennie McCarthy."

The conversation was objected to. We think it was competent, as bearing upon several important questions involved in the trial.

After the witness Zimmer had been permitted to detail the conversations which he held with the defendant in respect to the adjustment of the loss, he referred to the fact that he had received notice from the bishop, through Father De Regge. When the witness was asked whether there was a communication from Bishop McQuaid with reference to the insurance, it was objected to as immaterial and incompetent, and the court ruled, "For the purpose of fixing the date of the conversation." To that ruling the defendant excepted. We think the ruling presents no error. The defendant, in that conversation, demanded the payment of the insurance money to himself, and the witness adds that the defendant said:

"They will do anything I tell them. He gave me the names of the trustees. * * * He said they were trustees with him; and he forming the third,—the majority,—this money must be paid to him."

In the same conversation the witness states that the defendant said:

"Anyway, there were two trustees and himself that had the management, and the only ones could be settled with; and if we settled with Bishop McQuaid, or any one else, he would hold us responsible."

Nor do we think it was error to receive the testimony of the conversation held with the defendant on the subject of the settlement of the losses, or to receive what the defendant said in respect thereto, in the following language:

"He said he was willing to sacrifice a little of it if they would make a settlement with him then and there."

And in speaking of the claim of the bishop that the money should be paid to him, the witness testifies that the defendant said:

"They cannot get that money. You cannot deal with anybody else but me, and if you settle with anybody else I will settle with you."

Before the evidence was received to which we have just adverted, there was testimony to the effect that the bishop was ex officio a member of the board of trustees; and there was also extensive evidence elucidating the relations which the bishop bore to the church society and to the defendant.

We think it was not error to receive the evidence of Boylan and Rebodou, trustees, to the effect that they had no part in obtaining the insurance in July, 1895, and that the same was obtained by the sole act of the defendant upon the properties that were destroyed.

Bishop McQuaid, of the diocese of the city of Rochester, was called as a witness for the people, and he testified to an interview with the defendant on the 11th of July, 1895, at St. Bernards Seminary, about 10 o'clock in the morning, and the witness added that he knew the occasion of the defendant's visiting the seminary, and said:

"It was in reference to a letter which I had written him. It was written either the evening before or early that morning. I am not certain which. I think it was that same morning. I may have written it late the evening before, but think early that morning, and sent it to him. The paper now shown me is a copy of that letter. I saw him two or three hours after that letter was sent to him. He then said something on the subject of this letter."

The witness was then asked: "Q. What did he say upon the subject of this letter?" This question was objected to by the defendant as incompetent and immaterial and irrelevant. The objections were overruled, and the defendant took an exception. The witness answered:

"He said he wanted to deny the charge. That the charge I had made was not true. I didn't see the letter with him at that time. He wanted to prove the charge made in the letter was not true. I said it was not necessary to bring witnesses, because his own appearance testified that it was true."

The original letter was then produced, and the bishop added, "That is in my handwriting, and is the original letter." The original was then offered in evidence, and it was objected to by the defendant "as incompetent and immaterial." The objections were overruled, and the defendant took an exception. The letter was received, and marked "Exhibit No. 44." The bishop continued his testimony, and said:

"I have been bishop of the diocese of Rochester 28 years next July, and know the law of the Catholic Church with reference to the powers of the bishop. At that time I had power to remove defendant. There was a rule which governed the priests in this diocese with regard to making regular annual reports. The trustees of each of the several corporations which are of the churches in this diocese consisted of the bishop, vicar general, the pastor, and two lay trustees of the congregation. These reports which were sent in pertained to the financial condition of the church. All of the moneys which were received from the churches

of the parish were kept within the parish. The report was simply a statement for my examination as to its financial condition. The moneys raised, from whatever source, for the benefit of the church and the carrying on of its charge, remained at all times in the custody of the pastor and the two lay trustees. There was also a rule with reference to the amount of salaries which were paid to pastors. Their salaries were to be raised out of the sums to be supplied in the parish. The annual salary of the pastor of this particular charge was $700."

In the course of the cross-examination the witness was asked whether there was any personal liability as far as the sisters were concerned, and he answered as follows:

"There was in this particular case. If he failed to carry on the parish, and raise the necessary money, I should remove him, and put some one in the parish. There was no personal liability on his part, so far as the sisters were concerned, outside of the revenues of the church."

We think the conversation between the bishop and the defendant on the 11th of July was competent, and was properly received. It tended to elucidate the relations existing between the defendant and his church and its superior officers, and to develop the exigencies which then were surrounding him, and his relations to its temporal affairs and his relations to his bishop. It tended to develop the fact that a crisis had come to him in respect to his relations with the church. Confessedly, the bishop was his superior in ecclesiastical relations, clothed with power to remove him from his pastorship of the church. It tended to develop facts which might legitimately be said to be potential in influencing the acts and conduct and demeanor of the defendant towards the church and its property, and tended to elucidate the motives of his conduct immediately succeeding the interview.

We come now to consider the more potential objection urged to the reception of the letter in evidence, and before considering the objection we will quote the letter of the bishop to the defendant:

"St. Bernards, July 11, 1895.

"Rev. J. M. Fitzgerald—Reverend Sir: Of late so many complaints have come to me of your repeated and public drunkenness that I cannot close my eyes any longer to your conduct. I now give you warning that, if you do not quit the use of intoxicating drinks altogether, and reform your life, I shall be obliged to send you to a house of correction, and remove you from the charge of souls. Your usefulness in your present mission is at an end, and the sooner you seek some other field of work the better it will be for yourself and for religion.

"Very respectfully,        B. J. McQuaid, Bishop of Rochester."

The principal objection now made to the reception of the letter seems to relate to the circumstance that it contained a charge against the defendant of intoxication, or, to be more accurate, in the language of the letter, "public drunkenness." No parts of the letter were objected to, at the time it was offered, by the defendant. On the contrary, his objections thereto were to the entire letter, and it is not too much to assume that, if any part of it was proper, he should have made specific objections to such parts as were improper. As to that part of it relating to intoxication, it is to be borne in mind that the bishop, in detailing the conversation held with the defendant, had already introduced very clearly the nature and tenor of the charge which he had made in the letter, and which he stood by and repeated in the interview with the defendant. If we recur to the testimony of the bishop, we

find that he says in relation to the interview with the defendant, as follows: "He wanted to prove the charge made in the letter was not true. I said it was not necessary to bring witnesses, because his own appearance testified that it was true." The natural and ordinary understanding of the language just quoted from the testimony of the bishop indicates that he had reference to the habit which the letter refers to in definite language. It is, therefore, not apparent that the letter of the bishop conveyed to the jury any further or different idea than was introduced by the conversation which was held between the bishop and the defendant, as revealed in the bishop's testimony. All this evidence was received with a view of enlightening the jury as to the motive which may have actuated the defendant in respect to the principal charge made in the indictment. The testimony of the bishop tended to show that an imminent crisis had arisen in the affairs of the defendant. The testimony also tended to show that the defendant was financially embarrassed; that his circumstances were such that, if he was immediately removed from the parish, he would lose the balance of the salary due to him, and that his financial standing would be exposed, and that he would be unable to liquidate his debts; and, therefore, there was immediate and present necessity for turning some of the property into money with a view of its coming from the insurance policies to the hands of the trustees, whom he was able to control, and, under the rules of the church, applying it towards the liquidation of the balance of indebtedness which he claimed against the Church of the Holy Cross.

Great latitude is allowed in developing facts which tend to show the motive of a party accused of crime. Judge E. Darwin Smith, in an opinion delivered in People v. Stout, 4 Parker, Cr. R. 129, said:

"It is impossible to define by any rule or put limits upon the facts that may be given in evidence in proof of motive, except that they must relate to the subject-matter, and be rationally adapted to establish the fact in issue. It is not necessary that the connection be so intimate as that the proof of one fact unavoidably involves or draws after it the other, as a legitimate and necessary consequence from an appropriate cause. It is sufficient if the evidence fairly tends to prove the assumed motive, and the jury may rationally and properly imply the motive from the act sought to be given in evidence. Baalam v. State, 17 Ala. 451; 1 Starkie, Ev. 502. So various are the motives which govern men, and so indefinable, that every case must necessarily be governed by its own particular circumstances. As various as are the objects of ambition, passion, or desire among men, so various may be the machinations and motives to crime, and so various must necessarily be the kind and species of evidence adapted, and proper to be received, to explain the motives and principles of human conduct, to unravel and reveal the webs and wiles of criminal purpose, and bring the offenders to justice."

In Pierson v. People, 79 N. Y. 436, it was said:

"Where the case depends upon circumstantial evidence, and the circumstances point to any particular person as the criminal, the case against him is much fortified by proof that he had a motive to commit the crime. Where the motive appears, the probabilities created by the other evidence are much strengthened."

In People v. Harris, 136 N. Y. 450, 33 N. E. 65, it was said:

"The rule that evidence in criminal cases should be confined strictly to the question in issue is not infringed upon because the evidence offered, while tending to prove some essential fact in the guilt of the accused, may also prove the commission of another offense. Such evidence is relevant and admissible, whenever its

presence goes to sustain the charge by showing scienter or motive; for these facts are essential elements of a crime."

Considering the whole volume of evidence relating to the questions presented in regard to the defendant's motive, the letter may be regarded as an official notification by the bishop that the defendant's relation to the church and its property was soon to terminate, and that, unless he was able to obtain moneys through the instrumentality of the policies of insurance, he was likely to be removed without his arrearages of salary being liquidated. The whole tenor of the evidence indicates that the defendant was possessed with the idea that, if the insurance money was received by the society, he could so dominate his associate trustees as to become the possessor of it, and thus liquidate the supposed indebtedness of the society to him, and aid him in extricating himself from the financial embarrassments surrounding him. So far as there was anything damaging in the letter to the defendant, it was in entire harmony with and in corroboration of the position assumed by the bishop in the interview which he held with the defendant; and, as we have before stated, the declarations made by the defendant to the bishop were competent evidence upon the question of the defendant's motive. The interview took place on the 11th of July, and according to the evidence the additional insurance policies were obtained on the 10th of July, and the defendant left Charlotte on the 16th, and on that day returned a telegram which has already been alluded to, and the fire occurred the following morning. With all this evidence before the jury, it was for it to draw such deductions and inferences therefrom as legitimately the evidence gave rise to. The bishop testified that:

"There was no reason and no objection to the trustees passing a resolution to pay him back salary. If he had the money in his hands, he might pay it, if he chose."

A very clear and exhaustive charge was delivered by the learned trial judge relating to the circumstances developed in the evidence, calling their attention to the rules of evidence, and to the rules of law applicable thereto, and in the course of the charge he said:

"I have been requested to charge you, gentlemen, that the fact that the defendant went voluntarily before the grand jury, and told his story, but has not taken the witness stand here, should not raise any presumption against him. That is true."

And later on he said, in referring to the statute:

"It says the jury are not to assume that he would deny or admit any of the evidence, but that the jury must consider that evidence as it stands, unaffected by the fact that the defendant does not take the stand."

We think the instruction thus given was a sufficient compliance with section 393, Code Cr. Proc., which declares that a defendant's neglect or refusal to testify does not create any presumption against him.

In People v. Rose, 52 Hun, 39, 4 N. Y. Supp. 787, in referring to this statute, it was said:

"Its particular meaning is that the court and jury must, so far as they can, determine his case without prejudice or inference against him, founded upon his omission to testify."

The exception was a general one to all that the court said to the jury in explanation of the statute. In response thereto the court observed:

"Is there any particular expression of the court that you wish to point out? I may have made some inadvertent statements in that respect that might be corrected."

In response to that the counsel for the defendant said, "Where your honor stated that his failure to take the stand was not a denial," etc. We think the exception presents no error.

Numerous exceptions were taken to the charge as delivered, and to refusals of requests made, and they have received attention, and none of them have been found to present prejudicial error. The case seems to have been very thoroughly tried in behalf of the contending parties, and intelligently and clearly submitted to the jury under proper rules of evidence and well-settled rules of law, giving to the defendant full benefit of the presumption of innocence until the contrary should appear. Whether there was a conspiracy or not promoted by the defendant to burn the building on the 16th of July, 1895, was a question of fact for the determination of the jury. In People v. McKane, 143 N. Y. 470, 38 N. E. 950, it was said:

"When a conspiracy is shown, or evidence on the subject given sufficient for the jury, then the acts and declarations of the conspirators in furtherance of its purpose and object are competent; and in a case like this it is not necessary, in order to make such proof competent, that the conspiracy should be charged in the indictment."

The trial judge instructed the jury in respect to the nature and character of circumstantial evidence which the law requires in order to prove the main allegation. His instructions complied with the rule laid down in the case to which we have just adverted, in which it was said: "They were instructed to acquit the defendant unless satisfied beyond a reasonable doubt that he counseled, advised, aided, abetted, or procured" the commission of the crime charged.

Numerous other exceptions were taken during the progress of the trial which have not been referred to in this already too protracted opinion. However, they have received attention, and an examination of them has not left upon our minds the impression that any of them present such error as requires us to disturb the verdict of the jury.

Section 542, Code Cr. Proc., lays down a rule to be observed by the court in the following language:

"After hearing the appeal, the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties."

That section has been construed and applied in People v. Chacon, 102 N. Y. 669, 6 N. E. 303; People v. Dimick, 107 N. Y. 13, 14 N. E. 178; People v. Doyle, 11 App. Div. 448, 42 N. Y. Supp. 319. In People v. Stout, supra, it was said by Judge E. Darwin Smith:

"It is obviously due to the public interest and to the faithful administration of public justice that courts of review should not reverse the proceedings of inferior courts upon slight and trivial grounds."

However, if, upon reading the evidence in the large volume produced upon the appeal, we were satisfied that prejudicial error had been com-

mitted by the trial judge, and that the jury, in consequence thereof, had gone wrong, we should feel it our conscientious duty to reverse the judgment entered upon the verdict.    The great question of the defendant's guilt or his innocence was fairly and intelligently submitted by the trial judge to his peers, and their verdict is adverse to the defendant.    We have found no sufficient ground to justify the court in interfering with the conclusion reached by the jury.

Judgment of conviction and order affirmed, and the judgment to be entered, certified, and remitted to the clerk of Monroe county, pursuant to section 547, Code Cr. Proc.    All concur.