WILLIAM PIERSON, Plaintiff in Error, v. THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

Upon the trial of an indictment for murder, the prisoner challenged the array of jurors on the ground that, an order having been granted requiring the drawing of additional jurors, one of the boxes required to be kept by the clerk, i. e., that containing the names of jurors who had attended a term of the court, and served, had not been kept, and was not brought into court as required by the Code of Civil Procedure (§ 1059). The challenge was sustained; the prisoner thereupon withdrew it; a jury was empaneled, and the trial proceeded. *Held*, that the prisoner could withdraw his challenge, and that he thereby waived the irregularity.

*Cancemi* v. *The People* (18 N. Y., 128), distinguished.

The prisoner was accused of having caused the death of W., the deceased, by poison. A physician who was called to see W. when sick from the the poison, and who examined and prescribed for him, as a witness for the prosecution was asked to state the condition in which he found W. at that time, both from his own observation and what W. told him; this was objected to on the ground that the evidence was prohibited by the statute (Code of Civil Procedure, § 834). The court overruled the objection, and the witness stated what he learned from his own examination of W., made in the presence of W.'s wife and the prisoner, and from their statements. There was nothing of a confidential nature in anything he so learned. *Held*, that the evidence was competent.

The object of the statute prohibiting the disclosure of professional information acquired by a physician in attending a patient, is to protect the the latter, not to shield one charged with his murder.

After evidence had been given on the part of the People showing an intimacy between Mrs. W. and the prisoner, who was a married man, before and after the death of W., and that the prisoner disappeared from his home February 19, 1877, eleven days after the death of W., the prosecution called B., a clergyman who resided in Michigan; he testified that the prisoner called at his residence with Mrs. W., February 26, 1877. The witness was then asked to state what took place between him and them at that time; this was objected to, and the objection overruled. The witness answered, in substance, that he married them, after the prisoner had, under oath, stated that there was no legal objection to his being married. *Held*, that the evidence was competent as showing motive, although it tended to prove another crime than that charged in the indictment.

(Argued December 10, 1879; decided January 13, 1880.)

ERROR to the General Term of the Supreme Court, in the fourth judicial department, to review judgment affirming

a judgment of the Court of Oyer and Terminer, in and for the county of Livingston, entered upon a verdict convicting the plaintiff in error of the crime of murder in the first degree. (Reported below, 18 Hun, 239.)

The facts appear sufficiently in the opinion.

*James Wood*, for plaintiff in error. The prisoner could not lawfully withdraw his challenge to the array after it had been sustained by the court. (*Lord Dacres Case*, Kelyng's R., 59; 1 Woodeson, 346; 3 Inst., 30; *People* v. *Cancemi*, 7 Abb., 271; 18 N. Y., 128; *Rex* v. *Williams*, Russ. & Ryan's C. C. R., 224; *Pfeiffer* v. *Comm.*, 3 Harris [Penn.], 468; *Rex* v. *Wolf*, 1 Chit., 401; 18 Eng. C. L., 115; *Comm.* v. *Canfield*, Thatcher's Cr. Cas., 510; *Stevens* v. *People*, 10 N. Y., 549; *McCloskey* v. *People*, 5 Park. Cr. R., 308; 1 Sellon's Pr., 477; *People* v. *McKay*, 18 J. R., 212; *State* v. *Williams*, 1 Rich., 188; *People* v. *Monaghan*, 1 Park. Cr. R., 570.) The court erred in overruling the objection to the facts testified to by the physician Coe as privileged communications. (2 R. S., 406, m. p. §§ 72, 73; Code of Civil Procedure, §§ 833, 834, 835, 836; *People* v. *Stout*, 3 Park. Cr. R., 670; *Wilson* v. *Rastall*, 4 T. R., 753; *Rex* v. *Withers*, 2 Camp., 578; *Bank of Utica* v. *Messereau*, 3 Barb. Ch., 592; *Parker* v. *Carter*, 4 Mumf. R., 273; Greenl. Ev., 278; 1 Edw. Ch., 439; 4 Paige, 460; 14 Wend., 637, 641; *Eddington* v. *Mut. L. Ins. Co. of N. Y.*, 5 Hun, 1; 67 N. Y., 185; *Dilleber* v. *Home L. Ins. Co.*, 69 id., 256; *Jackson* v. *Lewis*, 17 J. R., 475; *McClusky* v. *Cromwell*, 11 N. Y., 601; *Newell* v. *People*, 7 id., 97.) It was error to overrule the objection to the question to the clergyman from Michigan as it tended to prove another crime than the one charged in the indictment. (*Colman* v. *People*, 55 N. Y., 81; *People* v. *Hopson*, 1 Den., 574; *Rosenweig* v. *People*, 63 Barb., 635.)

*D. W. Noyes*, for defendant in error. The prisoner by withdrawing his challenge to the array of the jury and consenting to go to trial with the jury summoned waived any

supposed irregularity in the drawing of additional jurors, and cannot now be heard to question it. (*People* v. *Ranson*, 7 Wend., 417; *People* v. *Rathburn*, 21 id., 509, 541, 542; *Gardiner* v. *People*, 6 Park. Cr. R., 155; *Cancemi* v. *People*, 18 N. Y., 137; *People* v. *Cummings*, 3 Park. Cr. R., 343–346, 355, 356; *People* v. *Mather*, 4 Wend., 229, 245, 246; R. S., pt. 4, chap. 2, tit. 4, art. 2, § 52; *Baker* v. *Braman*, 6 Hill, 47; Joy on Confessions and Challenges, 229; Sedgwick on Statutes and Const. Law, 111; *Brunkell* v. *Giles*, 2 Moore & Scott, 41; 9 Bing., 13; *People* v. *Murray*, 5 Hill, 468–472; *Germand* v. *People*, 1 id., 343–345; *Embury* v. *Conner*, 3 N. Y., 511–519; *Lee* v. *Tilotson*, 24 Wend., 337; *Van Hook* v. *Whitlock*, 26 id., 43; *N. S.* v. *Rathborn*, 2 Pain. C. C., 578; *People* v. *McKay*, 18 J. R., 212–218; *Freeman* v. *People*, 4 Dew., 9, 31; *Rex* v. *Wolf*, 1 Chit., 401; *Rex* v. *Perkin*, Holt's Rep., 403, in 1698.) The testimony of the physician Coe was properly received. (Code, § 834; § 73, art. 8, tit. 3, chap. 7, pt. 38, R. S.; *Wilson* v. *Rastall*, 4 Durnf. & East., 759, 760; *Dutchess of Kingston's Case*, 11 Har., 242; *People* v. *Stout*, 3 Park. Cr. R., 670; 1 Greenl. Ev., § 248; *Edingston* v. *Mut. L. Ins. Co.*, 67 N. Y., 185–194; *Johnson* v. *Johnson*, 14 Wend., 637–641; 1 Phil. Ev., chap. 6, § 1, p. 163 [3d ed.]; *Merle* v. *Moore*, R. & M., 390; *Allen* v. *Public Administrator*, 1 Brad., 221; *Thayer* v. *Allen*, Selden note, 93; *Hewitt* v. *Prime*, 21 Wend., 79; Wharton Am. Crim. Law, §§ 591–774; 1 Vernon, 385; *Webb* v. *R. W. and O. R. R. Co.*, 49 N. Y., 420–426; *Costigan* v. *M. and H. R. R. Co.*, 2 Den., 609, 610; *Ryan* v. *N. Y. C. R. R.*, 35 N. Y., 216; *Stephens* v. *People*, 4 Park., 396, 454, 455; *People* v. *Thurston*, 2 id., 49; *People* v. *Lake*, 1 id., 495; 1 Phil. Ev. [3d Am. ed.], 192; *Aveson* v. *Lord Kinnaird*, 6 East., 188.) The testimony of the witness Butterfield was properly admitted. If for no other purpose it was clearly competent and material on the question of motive. (*People* v. *Stout*, 4 Park. Cr. R., 71, 72; *People* v. *Hopson*, 1 Den., 574–577; *Cary* v. *Hotaling*, 1 Hill, 311; Roscoe's Crim. Ev., 81; 1 Greenl. Ev.,

§ 63; *People* v. *Conkey,* 5 Park., 32; *People* v. *Wood,* 3 Park. Cr. R., 681; *Rex* v. *Clewes,* 4 Car. & P., 221; *Rex* v. *Clews,* 19 Eng. Com. L. R., 354; *Woods Case,* 3 Park. Cr. R., 681; *Stork* v. *State,* 4 Humph., 27, 525–529; *Johnson* v. *State,* 17 Ala., 618–625; *Walker* v. *State,* 1 Leigh. [Va.], 514.)

EARL, J.   William Pierson, the prisoner, was indicted in Livingston county for murder, in causing the death by poison of Leaman B. Withey, in February, 1877.   He was tried at the Oyer and Terminer of that county in February, 1878, and was convicted and sentenced to be hung.   His conviction was affirmed at the General Term of the Supreme Court. He has now brought his case into this court by writ of error, and seeks to have his conviction reversed for several errors which have been ably presented for our consideration by his counsel.

The first ground of error alleged has reference to the selection of the jury.   At the time of the trial of this case the Code required the county clerk to keep three jury boxes : (Code, §§ 1038, 1050, 1052.)   One was to contain, upon ballots deposited therein, the names of all the jurors returned from the various towns in the county by the town officers; another was to contain the names of all jurors who had attended a term of court and served ; and a third box was to contain the names of all the jurors, upon duplicate ballots returned by the town officers of the town in which the courts were appointed to be held.

The law provides that if additional jurors are needed at any term of court beyond the number regularly summoned to attend such term, the court may make an order requiring the clerk of the county to draw and the sheriff to notify any number of trial jurors specified in the order, which the court deems necessary, to attend that term ; and that the clerk must thereupon forthwith bring into court all the boxes wherein ballots containing the names of trial jurors are deposited ; and must, in the presence of the court, publicly

draw from such box or boxes as the court directs the number of trial jurors specified in the order : (Code, §§ 1058, 1059.) To comply literally with the law, the court must first make the order, the clerk must then bring into court the three boxes, and the court must then direct from which box or boxes the jurors must be drawn.

After the commencement of the term, the court made an order directing the clerk to draw from the county box and the sheriff to summon thirty-six additional jurors ; and later in the term, another order was made that the clerk draw from the county box and the sheriff summon fourteen additional jurors. In pursuance of these orders, the clerk brought into court the county box containing the names of the jurors returned from the various towns in the county by the proper town officers ; and publicly drew therefrom the number of jurors directed, and they were subsequently summoned by the sheriff to attend. It may be inferred, although not expressly so stated in the record, that the names of the jurors thus drawn and summoned were placed in the box with the regular panel for that term. At the time the jurors were thus drawn, the third box above specified, the town box, was also in court, but the second box, containing the names of jurors who had attended and served, was not in court, and such a box was not in fact kept by the clerk, and it did not appear what disposition was made of the jury ballots which should have been deposited in such box.

When the case was moved for trial, the prisoner challenged the array of jurors, and alleged, as a ground of challenge, that the second box was not kept by the clerk and brought into court at the time of drawing the jurors. The district-attorney took issue upon the challenge, and upon the trial of such issue the facts appeared as above stated, and the court sustained the challenge. The prisoner thereupon withdrew his challenge, and a jury was then empaneled and the trial proceeded. It is now claimed by the learned counsel for the prisoner that the challenge was properly sustained ; and that after it was sustained, the prisoner could not law-

fully withdraw it and go to trial before a jury thus irregularly drawn.

It is not important for us to determine whether the challenge was properly sustained, because, whether it was or not, we are of opinion that the prisoner could withdraw his challenge and waive any irregularity which existed in this case. The maxim *quilibet potest renunciare juri pro se introducto* is of quite general application. One may waive constitutional provisions intended for his benefit: (*Lee* v. *Tillotson*, 24 Wend., 337; *Van Hook* v. *Whitlock*, 26 id., 43; *The People* v. *Murray*, 5 Hill, 468; *Baker* v. *Braman*, 6 id., 47; *Embury* v. *Conner*, 3 N. Y., 511.) A prisoner may waive a trial by jury and plead guilty; he may waive a plea of *autrefois acquit* by not interposing it or withdrawing it; he may waive or withdraw a challenge to a juror; he could waive his right to have a challenge of a juror for favor tried by triers, and consent that it be tried by the court; he may waive objections to improper or incompetent evidence; in a court of special sessions he may waive a trial by jury and be tried by the court; he may waive a challenge to the array of jurors by a challenge to the polls; he could consent to the separation of the jury during the trial, when such separation, without such consent, would be ground of error. A man cannot legally be indicted and tried as accessory to a felony until the principal be convicted; and yet, if he go to trial, without insisting on the objection, he is held to have waived it: (*People* v. *M'Kay*, 18 J. R., 212; *People* v. *Mather*, 4 Wend., 229, 245, 246; *People* v. *Rathbun*, 21 id., 509, 542; *Stephens* v. *People*, 19 N. Y., 549, 563; *Gardiner* v. *People*, 6 Parker Cr. R., 155.) In *People* v. *Rathbun*, COWEN, J., said: "The prisoner may even waive his right to a trial at the hands of a jury on the merits, by pleading guilty. Having this power, no one will pretend that he cannot consent to anything less. He may waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court." In *Cancemi* v. *The People* (18 N. Y., 128), a case very much relied upon by the counsel for

the prisoner — twelve jurors were empaneled for the trial, and during the trial the prisoner stipulated that one juror might be withdrawn, and that the trial should proceed with eleven jurors. It did so proceed, and the prisoner was convicted. It was held that the conviction was illegal. The decision was based upon two grounds: that the parties could not by consent alter the substantial constitution of the court; and that the State has an interest in the preservation of the liberties and lives of its citizens, and will not allow them to be taken away without due process of law, even by the consent of those accused of crime. STRONG, J., said: " The substantial constitution of the legal tribunal and the fundamental mode of its proceeding are not within the power of the parties ; " that " the State, the public, have an interest in the preservation of the liberties and the lives of the citizens, and will not allow them to be taken away ' without due process of law ; ' " and he further said that the right to affect, by consent, the conduct of a case in a criminal prosecution, " should not be permitted to extend so far as to work radical changes in great and leading provisions as to the organization of the tribunals or the mode of proceeding prescribed by the constitution and the laws. Effect may justly and safely be given to such consent in many particulars ; and the law does, in respect to various matters, regard and act upon it as valid. Objections to jurors may be waived ; the court may be substituted for triers to dispose of challenges to jurors ; secondary instead of primary evidence may be received : admissions of facts allowed ; and in similar particulars, as well as in relation to mere formal proceedings generally, consent will render valid what, without it, would be erroneous."

That case is no authority for the contention of the prisoner's counsel in this case. Here there was due process of law. The prisoner was tried by a common law jury of twelve. The jurors all possessed the qualifications prescribed by statute, and they were selected and returned for jury service by the proper officials in the mode required by

statute. The consent evinced by the withdrawal of the challenge did not affect the substantial constitution of the tribunal before which the prisoner was tried. The objects of all the jury laws are to distribute the burden of jury service among all those liable to such such service and to secure impartial jurors of the requisite qualifications. To secure the first object lists of jurors are required to be made and returned to the county clerk in each county every three years. The names thus returned are required to be put into a box, from which jurors for any term of court are required to be drawn, and when a juror has once attended and served, his name is not to be returned to that box, but is to be placed in another box, to the end that he may not be drawn for service again until all have been drawn from the box first named : (Code, § 1051). The second object is attained by requiring that only persons of the prescribed qualifications shall be returned for jurors, and that they shall be chosen by lot. Now all these substantial provisions were observed in this case. The jurors upon the array were all persons who had been returned as such by the proper officials. They all possessed the statutory qualifications, and they were chosen by lot. When these substantial conditions exist, the rest must generally be matter of form, which can be arranged or waived by consent, tacit or expressed. Here the only irregularity alleged is that the second box was not kept or brought into court. The fact that it was not kept was not known to the court at the time it made the order designating the box from which the jurors were to be drawn. In the exercise of its discretion, and to carry out the manifest purpose of the law, it ordered the jurors to be drawn from the first box. A court would not be expected to order jurors to be drawn from the second box, containing the names of those who had once served, so long as there were sufficient names in the first box. It can not, therefore, be inferred, if all the boxes had been kept and brought into court and the orders then made, that different jurors would have been drawn and summoned from

those who were actually drawn and summoned. But even if it could be thus inferred, it cannot be denied that the persons empaneled to try the prisoner were jurors made so in the mode prescribed by law and possessing lawful qualifications. If, therefore, there was any irregularity which would be ground of error, it was merely formal, affecting no public interest, trenching upon no public policy; and to hold that it could not be waived would be without precedent and against reason.

While Withey was sick, suffering from the poison which is supposed to have been administered to him, Dr. Coe, a practicing physician, was called to see him by the prisoner; and he examined him and prescribed for him. On the trial, he was called as a witness for The People, and this question was put to him : " State the condition in which you found him at that time, both from your own observation and from what he told you?" The prisoner's counsel objected to this question on the ground that the information which the witness obtained was obtained as a physician, and that he had no right to disclose it; that the evidence offered was prohibited by the statute. The court overruled the objection, and the witness answered, stating the symptoms and condition of Withey, as he found them from an examination then openly made in the presence of Withey's wife and the prisoner, and as he also learned them from Withey, his wife, and the prisoner. There was nothing of a confidential nature in anything he learned or that was disclosed to him. The symptoms and condition were such as might be expected to be present in a case of arsenical poisoning. It is now claimed that the court erred in allowing this evidence, and the statute (§ 834 of the Code) is invoked to uphold the claim. That section is as follows: "A person, duly authorized to practice physic or surgery, shall not be allowed to disclose any information which he acquired in attending a patient, in a professional capacity, and which was necessary to enable him to act in that capacity." This provision of the Code is a substantial re-enactment of a provision contained in the Revised Statutes : (2 R. S. 406). Such evi

dence was not prohibited at common law. The design of
the provision was to place the information of the physician,
obtained from his patient in a professional way, substantially
on the same footing with the information obtained by an
attorney professionally of his client's affair. The purpose
was to enable a patient to make such disclosures to his phy-
sician as to his ailments, under the seal of confidence, as would
enable the physician intelligently to prescribe for him ; to
invite confidence between physician and patient, and to pre-
vent a breach thereof: (*Edington* v. *Mut. L. Ins. Co.*, 67
N. Y., 185; 77 id., 564.)

There has been considerable difficulty in construing this
statute, and yet it has not been under consideration in many
reported cases. It was more fully considered in the *Eding-
ton case* than in any other or all others. It may be so liter-
ally construed as to work great mischief, and yet its scope
may be so limited by the courts as to subserve the beneficial
ends designed without blocking the way of justice. It
could not have been designed to shut out such evidence as was
here received, and thus to protect the murderer rather than
to shield the memory of his victim. If the construction of the
statute contended for by the prisoner's counsel must prevail
it will be extremely difficult, if not impossible, in most cases
of murder by poisoning to convict the murderer. Undoubt-
edly such evidence has been generally received in this class
of cases, and it has not been understood among lawyers and
judges to be within the prohibition of the statute.

How then must this statute be construed ? The office of
construction is to get a meaning out of the language used,
if possible. If the words used are clear and unmistakable
in their meaning, and their force cannot be limited by a con-
sideration of the whole scope of the statute or the manifest
purpose of the Legislature, they must have full effect. But
in endeavoring to understand the meaning of words used,
much aid is received from a consideration of the mischief to
be remedied or object to be gained by the statute. By such
consideration, words otherwise far-reaching in their scope

may be limited.   Statutes are always to be so construed, if
they can be, that they may have reasonable effect, agreeably
to the intent of the Legislature; and it is always to be pre-
sumed that the Legislature has intended the most reasonable
and beneficial construction of its acts.   Such construction of
a statute should be adopted as appears most reasonable and·
best suited to accomplish the objects of the statute; and
where any particular construction would lead to an absurd
consequence, it will be presumed that some exception or
qualification was intended by the Legislature to avoid such
consequence.   A construction which will be necessarily pro-
ductive of practical inconvenience to the community is to be
rejected, unless the language of the law-giver is so plain as
not to admit of a different construction :   (Potter's Dwarris
on Statutes, 202).

The plain purpose of this statute, as in substance before
stated, was to enable a patient to make known his condition
to his physician without the danger of any disclosure by him
which would annoy the feelings, damage the character, or
impair the standing of the patient while living, or disgrace
his memory when dead.   It could have no other purpose.
But we do not think it expedient, at this time, to endeavor
to lay down any general rule applicable to all cases, limiting
the apparent scope of this statute.   We are quite satisfied
with the reasoning upon it of Judge TALCOTT, in his able
opinion delivered at the General Term of the Supreme Court,
and we agree with him " that the purpose for which the aid
of this statute is invoked, in this case, is so utterly foreign to
the purposes and objects of the act, and so diametrically
opposed to any intention which the Legislature can be sup-
posed to have had in the enactment, so contrary to and
inconsistent with its spirit, which most clearly intended
to protect the patient and not to shield one who is charged
with his murder, that in such a case the statute is not
to be so construed as to be used as a weapon of defense
to the party so charged, instead of a protection to his vic-
tim."   This objection was, therefore, not well taken.

Upon the trial the People gave evidence tending to prove
that the relations between the prisoner and Mrs. Withey
were somewhat intimate prior to the death of her husband ;
but there was no clear proof that they were criminal. After
the burial of her husband and upon the same day, the pris-
oner took her and her sister to the residence of the latter
a distance of several miles, and he returned with Mrs
Withey alone, about half past one in the night of that day.
The prisoner was a married man, having a wife and five
children.   A few days after Withey's death, he began to sell
his property, and on the nineteenth day of February, eleven
days after the death, he disappeared from his home.   After
these facts had been proved, and near the close of the case on
the part of the prosecution, the People called Isaac Butter-
field as a witness ; and he testified that he resided in Jack-
son, Michigan, that he was a clergyman ; that he saw the
prisoner and Mrs. Withey at his residence in Jackson on the
26th day of February, 1877 ; and that by the laws of
Michigan, clergymen were authorized to perform marriage
ceremonies.   He was then asked this question :   "You may
state what took place between those parties and yourself at
the time you met them in Michigan ? "   The prisoner's coun-
sel objected to this question, and the objection was overruled.
The witness answered that they came to him and wished to
be married ; that he administered an oath to the prisoner,
as he was a stranger to him ; that the oath was that he would
correctly, according to his best knowledge and belief, answer
the questions addressed to him relative to his eligibility to
the matrimonial alliance he proposed ; that he then asked
him if he knew any legal objection to his entering into the
matrimonial alliance, and he answered that he did not ; and
then, after asking them other questions touching age, birth-
place, residence and occupation, he married them according
to the laws of Michigan.   I think the evidence was compe-
tent.   Crime is never committed without a motive ; and
hence, on the trial of a person charged with crime, it is
always competent to give evidence showing the motive

which induced the criminal act.    Where the crime is clearly proved and the criminal positively identified, it is not important to prove motives.    But where the case depends upon circumstantial evidence, and the circumstances point to any particular person as the criminal, the case against him is much fortified by proof that he had a motive to commit the crime. Where the motive appears, the probabilities created by the other evidence are much strengthened.    This evidence tended to prove that the motive which operated upon the prisoner was the desire to possess Withey's wife ; that his passion for her was so absorbing that he was determined to overcome all obstacles standing in his way.    One obstacle was the husband, and he was murdered.    Marriage was either necessary or desired ; and when he was confronted with the necessity of taking the oath, which he could not truly take, he overcame that obstacle by falsely taking it.    Thus, to accomplish his end, he commits two crimes ; and the last has an intimate relation to the first.    By the last he consummates a purpose in part achieved by the first ; and the fact that he would take this false oath and enter into this marriage, shows the overpowering nature of the motive which impelled him. That such proof is competent, even if it tends to prove another crime, has frequently been decided :    (*The People* v. *Wood,* 3 Parker, Cr. R., 681 ; *Stout* v. *The People,* 4 id., 71.)

There are other exceptions to which our attention has been called.    We have given them careful examination, and are of opinion that they are so clearly groundless that they do not need particular notice here.    We concur in what was said about them at the General Term.

The judgment should be affirmed.

All concur, except RAPALLO, J., not voting.

Judgment affirmed.