(30 Misc. Rep. 466.)

## PEOPLE v. BENHAM.

(Supreme Court, Special Term, Erie County. February, 1900.)

1. CRIMINAL LAW—NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.

On a motion for a new trial on the ground of newly-discovered evidence, affidavits will not be considered, for the purpose of showing good faith of application, which relate solely to evidence which defendant would not be permitted to prove at a new trial.

2. MURDER—ADMISSIBILITY OF EVIDENCE.

On a motion by a defendant, convicted of murdering his wife with prussic acid, for a new trial on the ground of newly-discovered evidence that defendant had been using prussic acid externally on his wife to cure a venereal disease, the affidavit of a female deponent stated that, shortly before deceased's death, she told deponent that defendant had been untrue to her, and had contracted a disease, which he had given her; that she was very sick with it, and that defendant was doctoring her. *Held*, that the statements were admissible as part of the res gestæ, since they were made during deceased's last sickness, and related to the use of the drug with which it was claimed she was poisoned.

3. SAME—TESTIMONY OF PHYSICIANS.

4. SAME—NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.

That a defendant convicted of murder, in his affidavit for a new trial on the ground of newly-discovered evidence, set forth evidence which was known to him and to his attorney at the time of the trial, at which he was precluded by his attorney from testifying, is insufficient to defeat the motion, where such evidence is only a part of that on which the motion for a new trial is based.

5. SAME—SUFFICIENCY OF EVIDENCE.

Defendant, convicted of murdering his wife with prussic acid, applied for a new trial on the ground of newly-discovered evidence. The evidence adduced at the trial was that deceased received an injury while giving birth to a child which left an opening between the vagina and rectum, from which she never recovered, though she regained substantially normal health otherwise; that defendant subsequently sustained intimate relations with women of ill repute; that defendant purchased prussic acid at different times; that during deceased's last sickness there were indications of excessive use of morphine, and several times deceased showed signs of intense pain and heart failure; that, after her death, an autopsy showed signs of diseased genital organs, a heart much below normal size, and traces of prussic acid in the brain, blood, and liver, but none in the stomach; and several experts testified that death was caused by prussic acid poisoning. The alleged newly-discovered evidence, as shown by the affidavits in support of the motion, was that defendant contracted gonorrhea, which he gave to his wife, and that he treated his wife for the disease with a solution of prussic acid used as a vaginal wash, and that it was possible for the prussic acid so used, owing to deceased's injured condition, to pass from the vagina into the rectum, and from there be absorbed in sufficient quantities to show traces in the brain and blood; and that the diseased condition of deceased's genital organs, as shown at the autopsy, indicated gonorrhea. The affidavits also showed that de-

ceased used as high as 20 grains of morphine a day, and that this would account for the weakened condition of her heart, and that the use of strong solutions of prussic acid in washing the vagina would cause the intense pain exhibited by deceased before death. *Held*, that the evidence was of a character which, if produced at trial, would probably have changed the verdict, and, if newly discovered, was sufficient to support the motion for a new trial.

Howard C. Benham, convicted of murder in the first degree, applies for a new trial on the ground of newly-discovered evidence. New trial ordered.

William E. Webster and Arthur C. Wade, for plaintiff.

Frederick S. Randall, Dist. Atty., and Myron H. Peck, Jr., for the People.

HOOKER, J. The defendant, Howard C. Benham, was indicted in Genesee county for the crime of murder in the first degree, in the month of February, 1897. He was charged with having committed this crime at Batavia, N. Y., on the 4th of January, 1897, by administering to his wife, Florence Tout Benham, a quantity of hydrocyanic acid,—commonly called "prussic acid,"—with the premeditated design and intention of effecting her death thereby, and from which she died at that time. The defendant was tried upon this indictment at a term of the court held in Genesee county, commencing in June, 1897. This trial resulted in a verdict of guilty as charged in the indictment, and the defendant was sentenced to be executed according to law on September 11, 1897. A motion was made for a new trial upon the ground that the verdict was against the law and the evidence, and upon the ground that some of the jurors were not proper persons to sit upon the trial and were guilty of misconduct, and upon the ground of newly-discovered evidence. The motion was denied, and from the judgment of conviction and the order denying the motion for a new trial an appeal was taken to the court of appeals, where the judgment and order appealed from were affirmed by a divided court. 55 N. E. 11. The defendant now moves for a new trial upon the ground that, upon another trial, he can produce evidence such as, if before received, would probably have changed the verdict. The motion is made under section 465 of the Code of Criminal Procedure, which provides:

"The court in which the trial has been had upon an issue of fact has power to grant a new trial when a verdict has been rendered against the defendant, by which his substantial rights have been prejudiced, upon his application, * * * where it is made to appear by affidavit that upon another trial the defendant can produce evidence such as, if before received, would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative and the failure to produce it upon the trial was not owing to want of diligence."

If the defendant has complied with these four requirements of the statute, and if each has been substantially fulfilled to the satisfaction of the court, he is entitled to another trial.

The principal question addressed to the court is: Has the defendant made it to appear that, upon another trial, he can produce evidence such as, if before received, would probably have changed the

verdict? A determination of this question involves an examination of the entire record, as well as a careful scrutiny of the affidavits presented upon this application. This is necessary in order to determine the probable effect of the newly-discovered evidence.

The defendant and the deceased were married on the 4th of August, 1892. For a time they resided at Byron, Genesee county, and subsequently removed to Batavia. In December, 1894, she gave birth to a child, and at the time received an injury from which she had never recovered. This injury left an opening from the vagina to the rectum about three inches in length. At times this opening permitted the rectal contents to be discharged through the vagina; at other times no such condition prevailed. Notwithstanding this injury, and the fact that she did not recover therefrom, she substantially regained her normal health. She was taken sick in the spring of 1896, and was attended by Dr. Townsend, who prescribed for her powders of morphia and phenacetin, which prescription contained 2 grains of morphia and 30 grains of phenacetin, divided into 12 powders. Preceding the birth of the child, and in anticipation thereof, she made a will, by which she bequeathed to any child or children, her surviving, the sum of $5,000; to her half brother, Earl W. Farrant, the sum of $2,000; and the residue of her estate she bequeathed to her husband, the defendant. The evidence produced upon the trial·tends to show that the defendant had, prior to the death of his wife, formed an attachment for a young woman then residing in Batavia, and it also tends to show, as does his affidavit produced upon this application, that he had sustained intimate relations with other women of ill repute. On the 14th of December, 1896, the defendant went to a druggist in the village of Batavia, and procured to be filled the prescription given by Dr. Townsend the April previous, saying that he wanted it for his wife; and, between that time and the time of her death, he procured this same prescription to be filled six times, including that of the 14th, making 72 powders in all, containing in the aggregate 12 grains of morphia. About a week before Christmas, 1896, he applied to a drug clerk in Batavia for an ounce of prussic acid, representing that he wanted it for the purpose of killing a dog. On the 26th of December he procured of the same drug clerk another ounce of hydrocyanic or prussic acid, and at the time of this purchase the drug clerk asked him if he had not yet killed the dog, to which he replied that the story about the dog was a joke; that he wanted it for the purpose of treating a stricture. The drug clerk replied, in substance, that jokes did not go in this business; that he had never heard of this poison being used for such a purpose; and that he could prepare him a solution that he believed would be better. He proceeded to put up this solution for the defendant, having first, however, put up the ounce of prussic acid, and, when the defendant took it, he reached over and took the vial of prussic acid also, saying that he would take that along, and use it in case the other did not work. He requested the drug clerk not to register the sale of this poison.

During this time, and up to the night of December 26th, Mrs. Benham was apparently in her usual health. She was at times riding and driving about the city. She was in the stores shopping, and,

to some extent, attending to her domestic and social affairs. On the night of December 26th she was taken ill, and Dr. Tozier was called in the afternoon of December 27th. He testified that he examined her, and found her pulse and temperature normal, and discovered no objective symptoms of disease. He left a prescription and gave directions as to her diet. The morning of the 28th he left some chlorodine tablets containing a twelfth of a grain of morphine, and that evening he discovered such symptoms of morphine that he directed the use of the tablets to be discontinued. The morning of the 29th he found further symptoms of morphine, and talked with the defendant about it, and the defendant showed him a powder of morphine which he said he had found under her pillow, and that Dr. Townsend had prescribed it for her on some former occasion, and that she had taken it ever since. Dr. Tozier said that was the cause of her present trouble, and directed that she should take no more of it. He suggested that he had better talk with her about it, and the defendant requested him not to do so, as she was sensitive about having it known that she was using the drug. The doctor suggested that she should have a nurse, to which the defendant replied, in substance, that her mother was coming, and a nurse would not be necessary. On the morning of the 30th he discovered still more symptoms of morphine, and that the deceased was restless, and continually pushing something from her face. The defendant then showed him a box of morphine powders, which he said he had found, and remarked that his wife had gotten to be a morphine fiend. The doctor again spoke about a nurse, and the defendant said her mother was coming that evening. The mother did come, and remained until the evening of the 31st. The morning of the 31st the doctor called, and on this occasion found no symptoms of morphine, and the deceased apparently better. He was called that evening by telephone, and when he reached the house found the deceased in a state of collapse. On examination he was unable to find any pulse. He gave her a nitroglycerine tablet, and waited a moment, and she did not seem to respond. He then gave her a hypodermic injection of brandy, and she quickly revived, and was soon talking.

The witness Kline, who was the defendant's coachman, testified, in substance, that the defendant requested him to remain in that night, to which he replied, "All right." The defendant then said, "Wait a few minutes," and went upstairs. Soon thereafter, Kline and Mrs. Prentice (who was working for the defendant as cook) heard Mrs. Benham scream at the top of her voice. The defendant called, and they both went upstairs. They found the deceased in bed, with her fingers twisted, her hands drawn up, and her eyes bulged out, throwing her hands and drawing up her feet and pushing them down against the footboard. She seemed to be in great distress. This continued for something like 15 minutes, during a portion of which time she was frothing at the mouth, and then commenced vomiting. They further testified that they observed some odor from her breath, which they had never discovered before. Dr. Tozier was called up by telephone, and soon after she was revived she spoke to her husband, and said: "Too strong! too strong! I told you it was too

strong." Dr. Tozier did not discover this odor; and, in this connection, it may be observed that he testified, in substance, that his sense of smell was somewhat impaired. The doctor remained a short time, until he thought Mrs. Benham was fully restored and out of danger, and then left some of the nitroglycerine tablets and went away.

Mrs. Prentice testifies that the next day the defendant went to her with a cup containing some liquid, and said that Mrs. Benham would not take it from him, and wished her to go upstairs and give it to her. She took the cup, and went to Mrs. Benham's room, and asked her to take the medicine, to which Mrs. Benham replied, "You wouldn't ask me to take it, would you?" Mrs. Prentice replied, "Why, I should like to see you get well." Mrs. Prentice then threw the contents out. Shortly after, the defendant came into the room, and asked if she had given the medicine, and she replied in the affirmative. He then stepped into the bathroom, and came back, and said, "You have not taken the medicine." Mrs. Prentice replied, "Well, perhaps it is just as well."

The evidence tends to show that Mrs. Benham from this time continued to improve, up to January 3d. Her mother returned that day, and that night suggested that she should remain with her daughter. The defendant objected to this, and said that he would stay with her. He did so, and some time in the night Mrs. Farrant (Mrs. Benham's mother) got up, and went to the boy's room, and on her way back she saw the defendant up, fully dressed, and inquired of Mrs. Benham if she was all right, and received an answer in the affirmative. Soon after that she heard talking between the defendant and his wife; that is, she heard what Mrs. Benham said, which was substantially this: "Howard, I don't want to take that. I don't see what you want me to take that for. I don't care; I think you are just as mean as you can be." A little while after that the defendant called. Mrs. Farrant immediately went to the room, and found her lying on her right side, her head turned over to the left. Her eyes were staring, her hands raised, and her fingers turned around. Mrs. Farrant tried to straighten out her fingers. The defendant had called the coachman, and was rapidly walking about the room, swearing because he did not come. He went to the telephone, and tried to ring up the doctor. Two unsuccessful attempts were made to reach the doctor by telephone. The coachman finally came, and the defendant scolded him for not coming sooner. The defendant then went to the doctor's, and, while the doctor was dressing, he (the defendant) hitched up the horse, and they drove rapidly to the defendant's house. On reaching the house the doctor ran in, and the defendant hitched the horse, and as he went into the room was informed by the doctor that Mrs. Benham was dead. He commenced crying, and said, "My God, this is not a fair deal." He went from place to place in the house, crying, and repeated this remark, or substantially this remark, several times. Soon after her death the story was started that she had died from the effects of an abortion, and the wife of Dr. Tozier called upon the coroner, and requested that an autopsy be held because of this rumor. An autopsy was held by Drs. Townsend and Showerman, witnessed by

Drs. L. L. and F. L. Tozier, on the 6th day of January, 1897. The abdominal cavity was opened, and the genital organs examined. The womb was found to be enlarged. An incision was made into the uterus, which discharged a small quantity of muco-pus, and more of this was discovered in one of the fallopian tubes. One of the ovaries was enlarged, and found to contain a cyst or abscess, which broke and discharged in the operation. An examination of the heart disclosed that it was below the normal size. It had stopped in contraction, expelling the blood. It was softened to such an extent that, when removed and placed on the bottom of a pan, it flattened out. Its walls were thin,—about half the normal thickness. One of the physicians pressed it with his thumb and finger, and it broke down under this pressure. The doctors discovered that she did not die from the effects of a criminal operation, and concluded that death resulted from heart failure, and thereupon Dr. L. L. Tozier made a certificate accordingly.

On January 9, 1897, the body was exhumed, and another autopsy held by the same physicians, assisted by Drs. L. L. Tozier, Andrews, and Prine. On this examination they found extreme rigor mortis. The brain was in an apparently healthy condition, although the arteries were filled with a pinkish, reddish-colored blood, the veins being empty. On making an incision into the scalp, similar blood or fluid flowed from the entire length of the incision, and when the skull was opened a strange and unfamiliar odor was observed. The stomach contained a quantity of coagulated milk, which had assumed about the shape of a small banana (Mrs. Benham had taken a quantity of milk a short time before her death). No clots were found in the blood. The liver was found to present a healthy appearance, although it had a brownish color on the edges and a pinkish color on the upper border. The brain, heart, spleen, stomach, a portion of the liver, and a piece of the small bowels were removed, and taken to Dr. Vandenburgh, of Buffalo, for examination and chemical analysis. He examined these organs, and analyzed their contents. He found no hydrocyanic or prussic acid, and no evidence or trace of any in the stomach or in its contents. He testified that he found evidences or traces of it in the brain, blood, and liver. Several experts were called, and testified that, in their opinion, Mrs. Benham died from the effects of prussic-acid poisoning. There are other facts and circumstances bearing upon the issues to which allusion might be made, but this is not deemed necessary in the determination of this application. It may be observed, however, that these are the facts and circumstances most damaging to the defendant's case, and those upon which the newly-discovered evidence set forth in the moving papers has the greatest bearing.

The defendant presents his own affidavit, in which he emphatically denies that he is guilty of the crime with which he stands convicted. He says that in 1890, while he was a postal clerk in the government service, he contracted gonorrhea, and that he consulted Dr. Whiton, then living at Brockport, N. Y., who examined him, and prescribed treatment and medicine for this disorder; that for a time he followed the treatment thus prescribed, but was unable to

effect a cure; that a fellow postal clerk named McAllister advised him to use a solution of prussic acid by injection as a remedy, and accompanied him to a drug store in Syracuse, where he procured this drug; that he used this as suggested, and effected a cure thereby, and that soon thereafter he communicated these facts to Dr. Whiton; that in 1895 he again contracted this disorder, and that he effected a cure in a similar manner. He further states that in November, 1896, he again contracted this disease, and before he was aware of this fact he had communicated it to his wife; that, when it was discovered that she was thus afflicted, she was deeply grieved. He talked with her about it, and believing he could effect a cure of both as he had theretofore done upon himself, and with that end in view, he applied to Jewell's drug store in Batavia, and procured a quantity of dilute prussic acid; that thereupon he used it regularly upon himself by injection, and his wife used it as a vaginal wash, and that together they used the quantity bought at that time, and later he bought another quantity at the same place and for the same purpose. He further states that his wife had been a sufferer since the birth of her child, and that this suffering increased after contracting this disease; that he talked with her, and urged that they call a physician, and tell him the whole truth, and that on one occasion they had concluded to do so, and Dr. Whitcomb was called, but before he reached the house Mrs. Benham changed her mind, and they did not do so; that, after Dr. Tozier was called, he suggested that they procure a nurse, but she did not wish to have a nurse, because she was afraid that the fact of this illness and its real nature might be discovered; that, on the evening of December 31st, he assisted her in using this solution in the usual manner, and, when he was preparing it, she cautioned him about getting it too strong; that, when this operation was concluded, he removed the bowl, and poured the contents down the trap in the bathroom, and, while he was replacing the cotton, she commenced screaming and writhing with pain; that he immediately called the help, and telephoned the doctor, who came immediately; that this was the occasion when she spoke to him, and said: "Too strong! too strong! I told you it was too strong." He further states that on the night of January 3, 1897, he remained with his wife, who was then suffering from the effects of this disorder; that in the forepart of the night he lay on the couch in her room with his clothes on, and that during the evening he told her that matters could not be permitted to run longer in this manner, and that they must tell the physician, so that she could be treated for this disease; that in the night he went downstairs through the library, and procured for her a glass of milk, which she drank. She complained of pain, and he offered her a morphine powder, which she declined to take, and stated that she had taken all she dared. She continued to complain of pain, and urged him to assist her in taking another vaginal injection of the prussic acid solution; that he prepared this in the usual way, and assisted her in using it. She suddenly straightened out, and stiffened. Her eyes were set and staring. He exclaimed, "Floss, what is the matter?" and immediately called for Mrs. Farrant and

63 N.Y.S.—59

the help.   That he went to the telephone, and endeavored to call up the doctor, but failed, and then went back, and sent Mrs. Prentice to the 'phone for this purpose, whose efforts in this respect were unavailing.   Soon thereafter he ran all the way to Dr. Tozier's house, aroused him, and while he was dressing defendant hitched up his horse, and drove as rapidly as he could to his home, and on reaching there the doctor ran into the house, and he hitched the horse and followed him, and as he was entering the room he was informed that Mrs. Benham was dead.   He further states that he never at any time administered or gave to his wife prussic acid in any other manner than as a vaginal injection, and then only in a diluted form, as he had many times used it upon himself; that she had used it many times herself in this manner, and he had several times assisted her in thus using it; and, so far as he knew or believed, it had been beneficial, and in no sense injurious.   He further says that before his arrest he stated to Judge North, in the presence of the district attorney of the county and the coroner, that he purchased this prussic acid, and that he procured it for the purpose of treating himself for this disorder; that he communicated all these facts to his attorney, and insisted upon going upon the witness stand and testifying in his own behalf and telling the whole truth; that he did not know of and could not produce any other evidence upon the trial to corroborate his own evidence; neither could he direct the attention of his counsel to any place or person where any such corroborative evidence could be obtained, except the fact, which was proved upon the trial, that he himself was afflicted with this disease, and that he was cured after he was confined in jail; that he was prevented by his counsel from testifying upon the trial; that he refused to follow the direction of his counsel in this respect until he was assured that his wife did not die from the effects of poison, and that the greatest chemists in the state were there, and would testify to this fact; that they did so testify, and because of this, and to shield the memory of his wife from the disgrace that he had brought upon her, he was induced to follow the directions of his counsel and remain silent; that he had entirely forgotten the incident with Dr. Skinner, of Wilkesbarre, Pa., and had entirely forgotten his name; that reading the affidavit of his physician recalled the occurrence to his mind, and also the fact that on his return home he talked with his wife about this, and told her of this sanitarium for the treatment of morphine patients, and of his talk with him in reference to herself; that thereafter she corresponded with Dr. Skinner, the nature of which he does not know; that at the time of the trial he knew nothing of the evidence Mrs. Harris could give, as stated in her affidavit.

The defendant also presents upon this application the affidavits of Judge Safford E. North, Dr. Frank L. Tozier, and William E. Webster, each of whom testifies that before the trial defendant stated to them that he purchased this prussic acid for the purpose of treating himself for this disease; and Judge North says that the defendant made this statement to him on one occasion before he

was arrested, in the presence of the district attorney of the county and the coroner.  Dr. Frank L. Tozier says:

"I asked him what he was doing with prussic acid, and he said that several years before he had contracted gonorrhea, and finally cured it with an in-jection of prussic acid diluted with water; that at a recent date he had con-tracted gonorrhea again, and had infected his wife with the same disease; that he was using the prussic acid [bought at Jewell's drug store], diluted with water, as an injection upon himself, and also upon his wife, as she wished to avoid letting any one know she had the disease."

The defendant's statements of his communication to his attorney of the facts stated in his affidavit are fully corroborated by the affi-davit of William E. Webster, read upon this application, as are also his statements of the reasons why the defendant did not testify upon the trial in his own behalf.

Cordello Herrick, chaplain of Auburn prison, states in his affi-davit that soon after the defendant's confinement in that prison he stated to the chaplain that he bought the prussic acid, the purpose for which it was purchased, and the use made of it by himself and his wife, substantially as stated in the affidavit of this defendant.

Dr. Whiton testifies in his affidavit that in the month of August, 1890, he was visited by the defendant, and that he examined him, and he discovered that he was then suffering from this disease, and that he prescribed medicine which he sent by express to the defend-ant at Syracuse, and he produces an entry made in his books at that time showing this occurrence.  He further states that some time thereafter he met the defendant, who then informed him that the medicine which he had prescribed and sent to him had proved of little value; that he had used prussic-acid solution as an injection, which had effected a cure; that when he reached home he looked up this question, and found that the use of this acid was recom-mended by authorities for this disorder.

The affidavit of Dr. Aaron Skinner was read on this application, in which he states that from the fall of 1893 to some time in 1896 he was in charge of a sanitarium for the treatment of persons ad-dicted to the use of morphia and alcoholic liquors, at Wilkesbarre, Pa.; that in the fall of 1895 or winter of 1896 he was visited by the defendant at this sanitarium, who came there to consult him about himself and his wife; that defendant then stated that his wife had become addicted to the use of morphine, and also told him of the injury which she had received at the time of the birth of her child, because of which she had gotten into the habit of using con-siderable morphine; that he explained to defendant how he was treating patients of that character, and that in all probability she could be cured; the defendant expressed a desire to have this done, if it could be, regardless of cost; that the defendant also con-sulted him about himself, and disclosed the fact that he then had gonorrhea.  He took from his pocket a vial of prussic-acid solution, and stated that he was using that, by injection, as a remedy.  He obtained the permission of the doctor to use this remedy there on that occasion, and did then and there use it as an injection, in the

doctor's presence. The doctor examined the medicine, observed its color and general appearance, and states that it was a solution of prussic acid. He further says that soon after this occurrence he received a letter in a lady's handwriting, dated and postmarked at Batavia, N. Y., and signed "Florence Benham," in which the writer referred to this interview with the defendant, and explained the nature of the injury which she had received at the time of the birth of her child, and that she had been a constant sufferer from that time. She gave her weight, her height, her waist and chest measurement, and quite a detailed description of herself. Several letters passed between them, in one of which she stated that she had become addicted to the use of morphine, and was taking as high as 60 grains of this drug in three days; that none of her family or friends had any knowledge or idea that she was taking it in such quantities.

The affidavit of Eva Harris was also read, in which she testifies:

"A short time before Christmas, 1896, deponent called at the residence of said Howard C. Benham, and found Mrs. Benham dressed, but lying on her bed. She had been crying, and continued to sob and wipe her eyes after deponent went into her room. Deponent asked her what was the matter, and she answered that Howard had been untrue to her. I told her not to feel badly, and that he would get over that after awhile. She said that was not the worst of it; that he had contracted a disease, and given it to her, and that she was very sick with it. I asked her who was doctoring her, and she said nobody; that Howard had some medicine which he was using himself, and she was using it as a douche, but that she was not getting better. I told her she should send for a physician. She said Howard had sent for Dr. Whitcomb, but she did not dare to tell any doctor here for fear of the disgrace, but that she must have some one, and she guessed she would send for Dr. Townsend, of Bergen, and deponent told her she certainly must have some one, and deponent a few days afterwards learned that they had employed Dr. Tozier."

She further says that she never communicated to any one this conversation until October, 1899, when she told it to the defendant's mother.

The defendant also produced the affidavit of Dr. L. L. Tozier, in which he states that he was present at both autopsies held upon the body of the said Florence Tout Benham; that in the first autopsy the internal genital organs were examined with reference to the disease. "An incision was made in the uterus, and a small quantity of muco-purulent matter issued out of the incision, which would show that these organs were in a state of inflammation from some cause. It is impossible to say, no microscopic examination having been made, as to the character of this pus, but it presented an appearance similar to the discharge which is frequently observed in gonorrhea cases. If Mrs. Benham did have gonorrhea, it might account for many of the symptoms manifest during her last illness, and which were testified to upon the trial of this indictment by me. While visiting Mrs. Benham during her last illness, I observed symptoms that I thought might be attributed to uterine irritation or inflammation, and I stated to the defendant that an examination ought to be made. He and I were downstairs at the time, and had some talk upon this subject, and it was finally agreed to leave it until the

next day, and in the meantime he was to talk with his wife (Mrs. Benham) about it. The next day, when I went there, I took my gynecological satchel with me, for the purpose of making an examination." He further states that the defendant then informed him of the injury which his wife had received at the time of the birth of her child, and for this reason she was very sensitive, and preferred not to have an examination made at that time.

Dr. Albert H. Hamilton, a chemist and microscopist of Auburn, N. Y., whose affidavit was read, states that, if Mrs. Benham had taken prussic acid through her mouth into her stomach, the same "would have left its evidence in the stomach, and that the chemist making the analysis would have detected the presence of prussic acid in the stomach in corresponding quantities to that found in the blood, liver, and brain."

The affidavit of Drs. Hazeltine and Brooks was read, in which each states that he has had considerable experience in treating patients addicted to the use of morphine; that they have heard read the evidence of Dr. Tozier, describing the condition of Mrs. Benham on the night of December 31, 1896, and noted fully the symptoms which he and the witnesses Kline and Mrs. Prentice described; and that, if Mrs. Benham were at that time addicted to the use of morphine in large quantities, if she had been taking 20 grains of morphia a day, or anywhere near that amount, and if her heart at that time was so weak and in a degenerated condition that it would break down by pressing it between the thumb and fingers, all of the conditions and symptoms referred to by Dr. Tozier and the witnesses Kline and Prentice on that occasion might reasonably be the result of taking from her the morphia that day; that this drug acts as a heart stimulant, and, when Dr. Tozier gave her the hypodermic of brandy, he temporarily supplied what had been taken away by taking the morphia from her.

Standard medical authorities were read upon the argument of this motion, to the effect that prussic acid taken into the stomach invariably produces ecchymosed spots upon the mucous membrane.

In opposition to this motion, the people presented the affidavits of Byron R. Newton, Fred H. Dunham, Frank L. Tozier, Granville R. Safford, L. L. Tozier, William Guernsey, Charles W. C. Howe, William McCormick, and Lulu Prentice.

Mr. Newton states that he was a reporter of the Buffalo Evening News, and that while defendant was confined in the jail in Batavia he stated to this witness that Dr. Rittel advised the use of prussic acid for his disorder; that Dr. Rittel was then dead, and it would be of no use to say it was he, as people would only laugh at him.

Mr. Safford states that a purported interview with the defendant was published in the Batavia News on August 7, 1897, which represented him as having made substantially the same statement.

Mr. Guernsey states that he knew Andrew C. McAllister, who was a postal clerk on the New York Central road, and who died in January, 1890. Attached to this affidavit is the certificate of the board of health of Albany, N. Y., showing the death of Andrew C. McAllister, January 23, 1890.

Mr. McCormick states that he knew McAllister, and that he was the only postal clerk by that name on the New York Central Railroad at that time, and that he died on January 23, 1890.

Dr. Frank L. Tozier states that the defendant stated to him that the use of prussic acid was recommended by a friend in Batavia. The witness does not give the name of the friend, but states that he now resides in that village.

Dr. L. L. Tozier states that, "while he discovered a small amount of muco-purulent matter in the uterus, it might have been caused by a gonorrheal inflammation, yet there was no evidence of gonorrhea observed by me"; that it would be impossible to tell whether it was gonorrhea discharge without a microscopic examination; that it might have been caused by the injury which she received at the time of the birth of her child. He further states "that many of the symptoms manifested by Mrs. Benham during her last illness, which were testified to upon the trial of this indictment by deponent, while occasionally occurring in gonorrhea, might also have been induced by other causes."

Lulu Prentice states that she never discovered any appearance of venereal disease, and that she had never informed any person that she had any knowledge of any syringe being in defendant's house at any time, and that she did not see Mrs. Harris in defendant's house during the five months preceding Mrs. Benham's death.

The statements of the defendant to Dr. F. L. Tozier, Judge North, and Chaplain Herrick, as disclosed in their affidavits, cannot be regarded as competent evidence in the defendant's favor upon the trial of this indictment. It was not contended by his counsel upon the argument of this motion that such statements were competent, but it was urged that they were important upon his application, as tending to demonstrate that the facts related by the defendant at this time were not invented for the purpose of this motion. Even under this contention, the statements to these witnesses are of no force here; for the obvious reason that he could not be permitted to prove them upon a new trial.

The other affidavits tend to prove these facts: That the defendant, at and prior to the death of his wife, was afflicted with gonorrhea; that Mrs. Benham was, and for some time prior thereto had been, similarly afflicted; that both were using hydrocyanic acid, or prussic acid, in a diluted form, he as an injection, and she as a vaginal wash, as a remedy for this disease; and that Mrs. Benham, for some time prior to her death, had been addicted to the excessive use of morphine. It was shown upon the trial that the defendant had contracted this disease, and that he was treated for it and cured after he was confined in jail, but there was no evidence offered or received that he had ever used this poison in this or any other manner as a remedy, or that Mrs. Benham was thus afflicted, or that she had ever used the same or a similar remedy, or that she was addicted to the excessive use of morphia.

It was urged upon the trial by the prosecution, and properly so, that the defendant had furnished no explanation for the purchase of this deadly poison, and no evidence was offered that a drop of it

was ever used for the purposes now stated. The statement of Dr. Skinner that in the fall of 1895 or winter of 1896, "as he now remembers the time," the defendant consulted him about this disease which he had then contracted, and in his presence took an injection of prussic-acid solution as a remedy, taken in connection with the fact that in December, 1896, he was again afflicted with this disease, has a direct bearing upon the motive of the defendant in making the two purchases of this drug at that time, and tends to corroborate him in the statements which he now makes as to the purpose of the purchase and the use made of it. The statement of Dr. L. L. Tozier that the discharge of muco-purulent matter from the incision made in the uterus on the first post mortem examination is such as usually attends gonorrhea cases; that during her illness he discovered symptoms of uterine trouble to such an extent that he deemed an examination necessary; and that, if she was in fact afflicted with this disease, it might account for many of the conditions and symptoms observed by him during her last illness, and testified to by him upon the trial,—cannot be regarded otherwise than as important. The statements of Mrs. Harris to the effect that, just prior to Christmas, 1896, Mrs. Benham disclosed to her the infidelity of her husband, the fact that he had contracted a disease and communicated it to her, and that she was "very sick with it," and that he had some medicine which he was taking, and which she was using as a douche, taken in connection with the statements of Dr. L. L. Tozier referred to, tend strongly to prove that the deceased was afflicted with this disorder. It is contended by the prosecution that the evidence of Mrs. Harris is inadmissible, but our attention has not been called to any authority holding that it is so. It was a statement of the deceased regarding the use of the very drug with which it is claimed she was poisoned, and, if she were afflicted with this disease, it may be said to have been made during her last illness. The prosecution was permitted to prove upon the trial, by other witnesses, statements of Mrs. Benham during her last illness. We think, therefore, the statements to Mrs. Harris may be regarded as a part of the res gestæ, and are admissible.

The statement of Dr. Whiton that he treated the defendant for this same disease in 1890 may be less important, but it tends to corroborate the defendant in his statement that he contracted this disease at that time. The evidence of Dr. Frank L. Tozier, as to his observation of the discharge of muco-pus on the first post mortem examination, to some extent corroborates the other Dr. Tozier in this respect.

The first purchase of prussic acid at Jewell's drug store was made about a week before Christmas, 1896, and the second on the 26th of December. It is not claimed that the defendant made any attempt to poison his wife, or that he used any of this drug for such a purpose, until the night of December 31st, five days after he purchased the second quantity. These purchases were made by the defendant at the store of his neighbor and friend, the first being made in the presence of Mr. Watson. On the theory that it was done by him for the purpose and with the intent of administering it to his

wife, and of effecting her death thereby, it is difficult to account for the purchase of the second quantity, with the disposition of the first unexplained. On the theory, however, that it was procured for the purpose of treating himself and his wife, as he now asserts, both purchases may reasonably be accounted for. The fact that the defendant stated an untruth to the drug clerk from whom he procured this poison is not inconsistent with this theory. It is not strange that he would avoid stating the real purpose for which the purchases were made.

It is now urged by the defendant that had the evidence now disclosed by the affidavits of Drs. L. L. Tozier, F. L. Tozier, Whiton, Skinner, Mrs. Harris, and himself been introduced upon the trial, in connection with the fact that no prussic acid, or evidence or trace thereof, was found in the stomach, and that effects usually produced upon that organ by swallowing prussic acid were entirely absent, and the fact that an injection of this solution into the vagina might have passed through the opening caused by the injury at the time of the birth of the child, into the rectum, and been absorbed into the system, it might account for the evidence of this poison in the blood, brain, and liver, and that the jury would probably have found that its purchase and use were without any intention on his part of causing any injury to his wife. In this contention we are inclined to concur. It was contended by the prosecution upon the trial, and upon the argument of this motion, that the defendant, during the month of December, 1896, purchased and administered to his wife morphia, with the intent and for the purpose of effecting her death, or of reducing her to a state of insensibility to better enable him to administer to her this prussic acid. The evidence of Dr. Skinner, as stated in his affidavit, tends to show that she was addicted to the use of morphine to the extent of taking 20 grains in a single day. If this statement be true, and if this condition continued down to the time of her last illness, the contention of the prosecution in this respect could have no force or effect, and it would tend to explain the discovery by Dr. Tozier of the symptoms of morphia during the time he was treating her.

It may be observed in this connection that Dr. Tozier testified upon the trial that he discovered such evidence of the use of morphia by the deceased as to lead him to the suspicion that she was attempting to take her own life by the use of that drug, and that he communicated this suspicion to the defendant, and suggested that a skilled nurse be employed to watch her. This evidence would tend to show that the excessive use of morphia, disclosed by Mrs. Benham to Dr. Skinner, continued down to about the time of her death, and the evidence of Dr. Skinner upon this point, if admissible, is important, as is also the evidence of Drs. Hazeltine and Brooks as to the probable effect of taking this stimulant away from her on December 31st. The admissibility of this evidence of Dr. Skinner upon this point is denied by the prosecution, for the reason, as claimed, that it is privileged, under section 834 of the Code of Civil Procedure. This provision of the statute was enacted for the protection of the patient, and to enable him to make known his con-

dition to the physician without the danger of any disclosure by him. In a case to which this section of the Code is applicable, the privilege cannot be waived by any one save the patient, and, if he be dead, the seal of the statute cannot be removed. The aid of this section cannot, however, be invoked to shield a person charged with the murder of the patient. This was held in Pierson v. People, 79 N. Y. 424; People v. Murphy, 101 N. Y. 129, 4 N. E. 326; and in Same v. Harris, 136 N. Y. 423, 33 N. E. 65. In Pierson v. People, supra, the physician was permitted to testify, under the defendant's objection, to the confidential communications made to him by the deceased. On the trial of this action, Dr. Townsend was permitted to testify to the illness and condition of Mrs. Benham in the spring of 1896, and of his treatment of her on that occasion. If, therefore, such declarations and confidential communications from the patient to the physician are admissible under this statute, when they tend to prove the crime of murder, are they any the less admissible when they tend to disprove it? We think not, and it follows that the evidence of Dr. Skinner is admissible.

The affidavits read by the prosecution in opposition to this motion tend in some respects to disprove the statements made by the defendant. The affidavits of Mr. Newton and Dr. F. L. Tozier tend to show that the defendant made a different statement to them as to the person who advised the use of prussic acid, and other witnesses testified to the death of the mail clerk, McAllister, prior to the time the defendant claims that he procured this drug in 1890. These are not deemed of great importance in the disposition of this question. The defendant might easily be mistaken in the name of the postal clerk who accompanied him to the drug store in Syracuse nine years ago, and he may have purposely misled the other witnesses as to the source of his information as to the use of this drug. In any view, we cannot see that these matters impair to any great extent the force of this application.

The proof of the defendant's guilt rests upon circumstantial evidence alone, and, while the post mortem examination and the disclosures made thereby were not deemed sufficient, standing alone, to satisfy the court as to the cause of death, yet, when taken in connection with all the other evidence, it was held sufficient to justify a finding by the jury that death resulted from hydrocyanic or prussic-acid poisoning. If the evidence now offered had been introduced upon the trial, in connection with all the other evidence, we think it probably would have changed the verdict. It follows, therefore, that the first requirement of the statute has been complied with.

The newly-discovered evidence here referred to as having an important bearing upon the issues in this case has all been discovered since the trial, except that which the defendant himself gives, and to that extent it fulfills that requirement of the statute. Obviously, the defendant's own evidence was known to him at the time of the trial; and, from his own statements and the affidavit of Mr. Webster, it appears that it was made known by him to his counsel at or prior to the trial. The defendant insisted upon taking the witness stand and testifying in his own behalf to the facts which he now

states, but was precluded from doing so by his counsel. It is urged by the prosecution that the defendant's evidence is not newly discovered, and that upon this application he cannot be heard to say that for prudential reasons he did not take the witness stand himself and testify to the facts which he now discloses. If there were no evidence offered except that of the defendant himself, this contention would have much force (People v. Moore, 29 Misc. Rep. 574, 62 N. Y. Supp. 252); but the evidence of the other witnesses is, in some respects, as important as that of the defendant, and, if substantial justice, "which is the ultimate end of all law," can be best attained by a new trial, it will not be denied because some of the evidence was known at the time of the trial. In People v. Lane, 31 Hun, 13, the defendant was convicted of the crime of robbery in the first degree. He was examined upon the trial as a witness in his own behalf, and thereby subjected himself to an attack upon his character and reputation by the prosecution, who called witnesses who testified to his bad character. He had witnesses subpœnaed and in court at the trial to testify to his good character, but for some reason unexplained they were not called. A motion was made for a new trial upon the ground of newly-discovered evidence, which consisted, in so far as it was considered in the final disposition of that application, solely and only of the evidence of reputable people as to his good character. The recorder denied the application, and an appeal was taken to the general term, where the decision of the recorder was reversed, and a new trial awarded. In the opinion of the general term in that case, Brady, J., says:

"It may be said with very great propriety that, considering the youth of the prisoner, his positive denial of the accusation against him, and the evidence relating to the alibi, if he had superadded to that evidence of good character, given by persons of respectability, such proof would probably have changed the verdict. Assuming the counsel to have known of the presence of the witnesses for that purpose, and that he omitted to call them, such omission should not act to the prejudice of the appellant. * * * It is not intended, by the view which is taken of the application made to the court below, to encourage applications of this nature, or to establish as a general rule that the omission of counsel to call witnesses upon a vital point in a case shall find favor in applications for a new trial. When, however, it is the conviction of the court of review that injustice has arisen from the incidents of the trial, and the application for a new trial is brought within the provisions of the Code, supra, a new trial will be granted without hesitation."

In People v. Hovey, 1 N. Y. Cr. R. 324, it was held that the failure to produce the newly-discovered evidence was the grossest negligence. Nevertheless, the court was unwilling to deny the application on that ground. In the opinion in that case, Donohue, J., says:

"Although there was the grossest laches, still, if the evidence was important, the court, in a case in which human life is at stake, should be very guarded in depriving a prisoner of the slightest right he may possess."

Surely, the omission of counsel to call witnesses to give evidence known to him and to the defendant upon the trial ought not, as a rule, to find favor on applications of this character; but, in view of the other important evidence which has been discovered since the trial, this application should not be denied for the reason that the testimony which the defendant can give was known to himself

and his attorney at the time of the trial. The failure to produce the evidence of which the defendant had no knowledge was not from want of diligence. The failure to remember the interview with Dr. Skinner, under the circumstances, cannot prejudice the defendant upon this motion. Dr. Tozier was examined at great length upon this trial, and was interrogated as to all the conditions and symptoms of Mrs. Benham which he observed during her last illness, and he nowhere suggests that he at any time discovered symptoms of uterine trouble, or that he deemed or suggested an examination advisable or necessary. Doubtless, this had escaped his memory, as the conversation about it had escaped the memory of the defendant himself; and this evidence, as well as the testimony of Dr. Skinner, under the circumstances, may be fairly regarded as discovered since the trial. The section of the statute under which this application is made was enacted to aid in the promotion of justice, and whenever it is made to appear that a person convicted of crime can produce evidence upon another trial "such as, if before received, would probably have changed the verdict, if such evidence has been discovered since the trial, is not cumulative, and the failure to produce it upon the trial was not owing to want of diligence," a new trial ought to be awarded without hesitation. There is no fixed rule by which all applications of this character can be determined. "Each case is a law unto itself, and the promotion of substantial justice is the aim in their determination." Smith v. Matthews, 21 Misc. Rep. 150, 47 N. Y. Supp. 96; Plate Co. v. Barclay, 48 Hun, 54; Sistare v. Olcott (Sup.) 5 N. Y. Supp. 114; Barrett v. Railroad Co., 45 N. Y. 628; Clegg v. Newspaper Union, 51 Hun, 232, 4 N. Y. Supp. 280. The defendant on this application has substantially fulfilled all the requirements of the statute. A new trial, therefore, is ordered.

New trial ordered.